Exhibit 13



US010628857B2

(12) **United States Patent**
Shkedi

(10) Patent No.: **US 10,628,857 B2**
(45) Date of Patent: **\*Apr. 21, 2020**

(54) **METHODS AND APPARATUS FOR FACILITATED OFF-SITE TARGETED INTERNET ADVERTISING**

(71) Applicant: **AlmondNet, Inc.**, Long Island City, NY (US)

(72) Inventor: **Roy Shkedi**, Forest Hills, NY (US)

(73) Assignee: **ALMONDNET, INC.**, Long Island City, NY (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 112 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/033,035**

(22) Filed: **Jul. 11, 2018**

(65) **Prior Publication Data**

US 2019/0019223 A1    Jan. 17, 2019

**Related U.S. Application Data**

(60) Continuation of application No. 14/091,285, filed on Nov. 26, 2013, now Pat. No. 10,026,100, which is a
(Continued)

(51) **Int. Cl.**
  *G06Q 30/02*      (2012.01)
  *G06Q 30/06*      (2012.01)

(52) **U.S. Cl.**
  CPC ......... *G06Q 30/0269* (2013.01); *G06Q 30/02* (2013.01); *G06Q 30/0214* (2013.01);
(Continued)

(58) **Field of Classification Search**
  CPC ....................................... G06Q 30/00–30/284
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

5,220,655 A    6/1993  Tsutsui
5,359,508 A    10/1994 Rossides
(Continued)

FOREIGN PATENT DOCUMENTS

WO            9721183 A1    6/1997
WO    WO1997021183 A1    6/1997
(Continued)

OTHER PUBLICATIONS

Newshare, Newshare Adshare Concepts, www.newshare.com, 1996, pp. 1-2 (Year: 1996).*
(Continued)

*Primary Examiner* — John Van Bramer
(74) *Attorney, Agent, or Firm* — Louis J. Hoffman

(57) **ABSTRACT**

A super-saturation method for information-media relates to directing information to an electronic media consumer (reader, surfer, viewer, listener, etc.). Embodiments of the present invention facilitate a first media entity substantially offering out of context information placement using a second media entity. A facilitator entity guarantees that a consumer of the second media is a known consumer of the first media. Accordingly, the second media entity presents an out of context information placement. For example, an Internet site "AAA" is oversubscribed with potential paying advertising content at $100 CPM. This site offers advertisers an option to present their advertisements to certified "AAA" viewers, albeit on a non-AAA Internet site, for $50 CPM. The facilitator locates certified AAA viewers at Internet site "BBB" that normally charges $30 CPM. Contracts between AAA, BBB, and the facilitator divide a new revenue stream of $20 CPM among them.

**33 Claims, 2 Drawing Sheets**



## Related U.S. Application Data

division of application No. 13/585,765, filed on Aug. 14, 2012, now Pat. No. 8,600,815, which is a division of application No. 13/368,686, filed on Feb. 8, 2012, now Pat. No. 8,244,586, which is a division of application No. 12/911,601, filed on Oct. 25, 2010, now abandoned, which is a continuation of application No. 10/996,491, filed on Nov. 24, 2004, now Pat. No. 7,822,639, which is a continuation of application No. 09/723,391, filed on Nov. 28, 2000, now Pat. No. 6,832,207.

(52) **U.S. Cl.**
CPC ..... **G06Q 30/0241** (2013.01); **G06Q 30/0255** (2013.01); **G06Q 30/0277** (2013.01); **G06Q 30/0633** (2013.01)

(58) **Field of Classification Search**
USPC ........................................... 705/14.1–14.73
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,442,633 A | 8/1995 | Perkins et al. | |
| 5,572,643 A | 11/1996 | Judson | |
| 5,710,884 A | 1/1998 | Dedrick | |
| 5,724,424 A | 3/1998 | Gifford | |
| 5,724,521 A | 3/1998 | Dedrick | |
| 5,751,956 A | 5/1998 | Kirsch | |
| 5,774,170 A | 6/1998 | Hite et al. | |
| 5,774,670 A | 6/1998 | Montulli | |
| 5,790,785 A | 8/1998 | Klug et al. | |
| 5,794,210 A | 8/1998 | Goldhaber et al. | |
| 5,796,952 A | 8/1998 | Davis et al. | |
| 5,801,702 A | 9/1998 | Dolan | |
| 5,812,769 A | 9/1998 | Graber | |
| 5,819,092 A | 10/1998 | Ferguson et al. | |
| 5,819,285 A | 10/1998 | Damico et al. | |
| 5,835,718 A | 11/1998 | Blewett | |
| 5,848,396 A | 12/1998 | Gerace | |
| 5,854,630 A | 12/1998 | Nielsen | |
| 5,855,008 A | 12/1998 | Goldhaber et al. | |
| 5,857,175 A | 1/1999 | Day et al. | |
| 5,870,546 A | 2/1999 | Kirsch | |
| 5,870,550 A | 2/1999 | Wesinger, Jr. et al. | |
| 5,901,287 A | 5/1999 | Bull et al. | |
| 5,918,014 A | 6/1999 | Robinson | |
| 5,933,811 A | 8/1999 | Angles et al. | |
| 5,937,037 A | 8/1999 | Kamel et al. | |
| 5,937,390 A | 8/1999 | Hyodo | |
| 5,937,392 A | 8/1999 | Alberts | |
| 5,948,061 A | 9/1999 | Merriman et al. | |
| 5,959,623 A | 9/1999 | Van Hoff et al. | |
| 5,963,915 A | 10/1999 | Kirsch | |
| 5,978,013 A | 11/1999 | Jones et al. | |
| 5,991,735 A | 11/1999 | Gerace | |
| 5,991,740 A | 11/1999 | Messer | |
| 5,996,007 A | 11/1999 | Klug et al. | |
| 5,999,912 A | 12/1999 | Wodarz et al. | |
| 6,009,410 A | 12/1999 | LeMole et al. | |
| 6,009,412 A | 12/1999 | Storey | |
| 6,014,638 A | 1/2000 | Burge et al. | |
| 6,016,504 A | 1/2000 | Arnold et al. | |
| 6,026,368 A | 2/2000 | Brown et al. | |
| 6,026,369 A | 2/2000 | Capek | |
| 6,026,374 A | 2/2000 | Chess | |
| 6,029,141 A | 2/2000 | Bezos et al. | |
| 6,047,310 A | 4/2000 | Kamakura et al. | |
| 6,049,835 A | 4/2000 | Gagnon | |
| 6,055,573 A * | 4/2000 | Gardenswartz ........ G06Q 30/02 709/219 |
| 6,061,660 A | 5/2000 | Eggleston | |
| 6,073,241 A | 6/2000 | Rosenberg et al. | |
| 6,094,657 A | 7/2000 | Hailpern et al. | |
| 6,108,637 A | 8/2000 | Blumenau | |
| 6,128,663 A | 10/2000 | Thomas | |
| 6,133,912 A | 10/2000 | Montero | |
| 6,134,532 A | 10/2000 | Lazarus et al. | |
| 6,151,624 A | 11/2000 | Teare | |
| 6,177,931 B1 | 1/2001 | Alexander et al. | |
| 6,188,398 B1 | 2/2001 | Collins-Rector et al. | |
| 6,189,008 B1 | 2/2001 | Easty et al. | |
| 6,205,432 B1 | 3/2001 | Gabbard et al. | |
| 6,216,112 B1 | 4/2001 | Fuller et al. | |
| 6,216,129 B1 | 4/2001 | Eldering | |
| 6,269,361 B1 | 7/2001 | Davis et al. | |
| 6,285,987 B1 | 9/2001 | Roth et al. | |
| 6,289,318 B1 | 9/2001 | Barber | |
| 6,308,202 B1 | 10/2001 | Cohn et al. | |
| 6,324,519 B1 | 11/2001 | Eldering | |
| 6,360,221 B1 | 3/2002 | Gough et al. | |
| 6,366,298 B1 | 4/2002 | Haitsuka et al. | |
| 6,385,592 B1 | 5/2002 | Angles et al. | |
| 6,401,075 B1 | 6/2002 | Mason et al. | |
| 6,408,278 B1 | 6/2002 | Carney et al. | |
| 6,415,270 B1 | 7/2002 | Rackson et al. | |
| 6,415,322 B1 | 7/2002 | Jaye | |
| 6,449,657 B2 | 9/2002 | Stanbach, Jr. et al. | |
| 6,468,084 B1 | 10/2002 | MacMillan | |
| 6,470,383 B1 | 10/2002 | Leshem et al. | |
| 6,477,509 B1 | 11/2002 | Hammons et al. | |
| 6,477,575 B1 | 11/2002 | Koeppel et al. | |
| 6,487,538 B1 | 11/2002 | Gupta et al. | |
| 6,490,587 B2 | 12/2002 | Easty et al. | |
| 6,519,571 B1 | 2/2003 | Guheen et al. | |
| 6,564,243 B1 | 5/2003 | Yedidia et al. | |
| 6,574,606 B1 | 6/2003 | Bell et al. | |
| 6,578,011 B1 | 6/2003 | Forward | |
| 6,584,492 B1 | 6/2003 | Cezar et al. | |
| 6,594,691 B1 | 7/2003 | McCollum et al. | |
| 6,606,745 B2 | 8/2003 | Maggio | |
| 6,609,198 B1 | 8/2003 | Wood et al. | |
| 6,633,850 B1 | 10/2003 | Gabbard et al. | |
| 6,654,725 B1 | 11/2003 | Langheinrich et al. | |
| 6,668,322 B1 | 12/2003 | Wood et al. | |
| 6,708,208 B1 | 3/2004 | Philyaw | |
| 6,771,290 B1 | 8/2004 | Hoyle | |
| 6,785,659 B1 | 8/2004 | Landsman et al. | |
| 6,804,659 B1 | 10/2004 | Graham et al. | |
| 6,810,527 B1 | 10/2004 | Conrad et al. | |
| 6,832,350 B1 | 12/2004 | Bates et al. | |
| 6,839,680 B1 | 1/2005 | Liu et al. | |
| 6,847,992 B1 | 1/2005 | Haitsuka et al. | |
| 6,874,023 B1 | 3/2005 | Pennell et al. | |
| 6,907,566 B1 | 6/2005 | McElfresh et al. | |
| 6,922,701 B1 | 7/2005 | Ananian et al. | |
| 6,925,440 B1 | 8/2005 | Shkedi | |
| 6,965,868 B1 | 11/2005 | Bednarek | |
| 6,973,436 B1 | 12/2005 | Shkedi | |
| 6,983,255 B2 | 1/2006 | Linehan | |
| 6,985,882 B1 | 1/2006 | Del Sesto | |
| 7,003,789 B1 | 2/2006 | Linehan | |
| 7,039,599 B2 | 3/2006 | Merriman, II | |
| 7,038,637 B1 | 5/2006 | Eller et al. | |
| 7,039,935 B2 | 5/2006 | Knudson et al. | |
| 7,047,551 B2 | 5/2006 | Owawa et al. | |
| 7,051,351 B2 | 5/2006 | Goldman et al. | |
| 7,062,535 B1 | 6/2006 | Stark et al. | |
| 7,069,573 B1 | 6/2006 | Brooks et al. | |
| 7,072,853 B2 | 7/2006 | Shkedi | |
| 7,085,682 B1 | 8/2006 | Heller | |
| 7,092,926 B2 | 8/2006 | Cerrato | |
| 7,130,807 B1 | 10/2006 | Mikurak | |
| 7,181,438 B1 | 2/2007 | Szabo | |
| 7,194,754 B2 | 3/2007 | Tomsen et al. | |
| 7,206,848 B1 | 4/2007 | Zara et al. | |
| 7,308,426 B1 | 12/2007 | Pitroda | |
| 7,319,975 B2 | 1/2008 | Monteverde | |
| 7,428,493 B2 | 9/2008 | Shkedi | |
| 7,454,364 B2 | 11/2008 | Shkedi | |
| 7,580,855 B2 | 8/2009 | Fernandes | |
| 7,747,745 B2 | 6/2010 | Shkedi | |

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,756,744 | B2 | 7/2010 | Schiff et al. |
| 7,822,637 | B2 | 10/2010 | Shkedi |
| 7,861,260 | B2 | 12/2010 | Shkedi |
| 7,930,252 | B2 | 4/2011 | Bender |
| 7,979,307 | B2 | 7/2011 | Shkedi |
| 8,051,444 | B2 | 11/2011 | Shkedi |
| 8,117,068 | B2 | 2/2012 | Shuster et al. |
| 8,200,822 | B1 | 6/2012 | Shkedi |
| 8,204,783 | B2 | 6/2012 | Shkedi |
| 8,239,264 | B2 | 8/2012 | Shkedi |
| 8,244,574 | B2 | 8/2012 | Shkedi |
| 8,244,582 | B2 | 8/2012 | Shkedi |
| 8,244,583 | B2 | 8/2012 | Shkedi |
| 8,280,758 | B2 | 10/2012 | Shkedi |
| 8,281,336 | B2 | 10/2012 | Shkedi |
| 8,494,904 | B2 | 7/2013 | Shkedi |
| 8,566,164 | B2 | 10/2013 | Shkedi |
| 8,589,210 | B2 | 11/2013 | Shkedi |
| 8,595,069 | B2 | 11/2013 | Shkedi |
| 8,607,267 | B2 | 12/2013 | Shkedi |
| 8,671,139 | B2 | 3/2014 | Shkedi |
| 8,677,398 | B2 | 3/2014 | Shkedi |
| 8,683,502 | B2 | 3/2014 | Shkedi |
| 8,695,032 | B2 | 4/2014 | Shkedi |
| 8,713,600 | B2 | 4/2014 | Shkedi |
| 8,775,249 | B2 | 7/2014 | Shkedi |
| 8,959,146 | B2 | 2/2015 | Shkedi |
| 8,997,138 | B2 | 3/2015 | Shkedi |
| 9,071,886 | B2 | 6/2015 | Shkedi |
| 9,078,035 | B2 | 7/2015 | Shkedi |
| 9,083,853 | B2 | 7/2015 | Shkedi |
| 9,131,282 | B2 | 9/2015 | Shkedi |
| 9,208,514 | B2 | 12/2015 | Shkedi |
| 9,226,019 | B2 | 12/2015 | Shkedi |
| 9,271,024 | B2 | 2/2016 | Shkedi |
| 9,351,053 | B2 | 5/2016 | Shkedi |
| 9,369,779 | B2 | 6/2016 | Shkedi |
| 9,508,089 | B2 | 11/2016 | Shkedi |
| 9,571,865 | B2 | 2/2017 | Shkedi |
| 9,591,380 | B2 | 3/2017 | Shkedi |
| 9,756,372 | B2 | 9/2017 | Shkedi |
| 9,800,917 | B2 | 10/2017 | Shkedi |
| 9,813,778 | B2 | 11/2017 | Shkedi |
| 9,830,615 | B2 | 11/2017 | Shkedi |
| 1,000,963 | A1 | 6/2018 | Shkedi |
| 1,007,020 | A1 | 9/2018 | Shkedi |
| 2001/0020231 | A1 | 9/2001 | Perri et al. |
| 2001/0025255 | A1 | 9/2001 | Gaudian |
| 2001/0034646 | A1 | 10/2001 | Hoyt et al. |
| 2001/0034451 | A1 | 10/2001 | Marks et al. |
| 2001/0039515 | A1 | 11/2001 | Mayadas |
| 2001/0041566 | A1 | 11/2001 | Xanthos et al. |
| 2001/0042002 | A1 | 11/2001 | Koopersmitch |
| 2001/0047297 | A1 | 11/2001 | Wen |
| 2001/0049701 | A1 | 12/2001 | Howerton, III et al. |
| 2001/0054001 | A1 | 12/2001 | Robinson |
| 2001/0054004 | A1 | 12/2001 | Powers |
| 2002/0002541 | A1 | 1/2002 | Williams |
| 2002/0007335 | A1 | 1/2002 | Millard et al. |
| 2002/0032608 | A1 | 3/2002 | Kanter |
| 2002/0049770 | A1 | 4/2002 | Mayadas |
| 2002/0052925 | A1 | 5/2002 | Kim et al. |
| 2002/0056109 | A1 | 5/2002 | Tomsen |
| 2002/0059602 | A1 | 5/2002 | MacRae et al. |
| 2002/0069105 | A1 | 6/2002 | do Rosario Botelho et al. |
| 2002/0072971 | A1 | 6/2002 | DeBusk et al. |
| 2002/0082910 | A1 | 6/2002 | Kontogouris |
| 2002/0082923 | A1 | 6/2002 | Merriman et al. |
| 2002/0124098 | A1 | 9/2002 | Shaw |
| 2002/0133412 | A1* | 9/2002 | Oliver .................. G06Q 30/02 |
| | | | 705/26.35 |
| 2003/0028451 | A1 | 2/2003 | Ananian |
| 2003/0061211 | A1 | 3/2003 | Shultz et al. |
| 2003/0110497 | A1 | 6/2003 | Yassin et al. |
| 2003/0126597 | A1 | 7/2003 | Darby et al. |
| 2003/0145323 | A1 | 7/2003 | Hendricks et al. |
| 2003/0208756 | A1 | 11/2003 | Macrae et al. |
| 2003/0208758 | A1 | 11/2003 | Schein et al. |
| 2004/0010546 | A1 | 1/2004 | Klug et al. |
| 2005/0091111 | A1 | 4/2005 | Green et al. |
| 2005/0108776 | A1 | 5/2005 | Carver et al. |
| 2007/0050478 | A1 | 3/2007 | Hickman et al. |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | WO 99/044159 | 9/1999 |
| WO | WO1999057660 A1 | 11/1999 |
| WO | WO 00/08583 | 2/2000 |
| WO | WO 00/16529 | 3/2000 |
| WO | WO 00/54201 | 9/2000 |
| WO | WO 01/15405 | 3/2001 |

OTHER PUBLICATIONS

In re Doubleclick Inc. Privacy Litigation; Opinion and Order, SDNY, 154 F. Supp. 2d497, Filed Mar. 29, 2001.

Broussard, Gerard; "How Advertising Frequency Can Work to Build Online Advertising Effectiveness"; International Journal of Market Research; Winter, 2000.

Winn, Jane Kaufman; Wrathall, James R.; "Who Owns the Customer? The Emerging Law of Commercial Transactions in Electronic Customer Data"; Business Lawyer; Nov. 2000.

Hunt, J. Timothy; "Moving Target . . . "; Financial Post; p. 48; Oct. 1, 2000.

Duberman, Josh; Deaudet, Michael; "Privacy Perspectives for Online Searchers (Internet/Web/Online Service Information)"; Searcher; Jul. 2000.

Cartwright, David; "Learn More About Who Uses Your Site"; Internet Magazine; p. 115; Jun. 2000.

"Cookies Misfortune?"; Yorkshire Post; Apr. 5, 2000.

Homer, Steve; "We know where you live"; Independent; Mar. 6, 2000.

Reimers, Barbara DePoma; "Getting Personal—Advanced Analytics Can Help E-businesses Land Customers"; InformationWeek; Jan. 3, 2000.

Excite@Home Announces TrueMatch Charter Advertising Program; press release, Nov. 1, 1999.

Smolova, Klara; "Unlocking the Ad Power of the Web"; Prague Tribune; May 27, 1999.

Aho Williamson, Debra; "Program Rewards Frequent Visitors: Sportsline USA Develops Way to Create Loyalty and Grow Database"; Advertising Age, p. 50; May 17, 1999.

"Ad Agencies Play with Internet Strategies"; Frohlinger's Marketing Report, vol. 12, No. 8; Apr. 26, 1999.

24/7 Real Media Inc.—TFSM, Form S-1/A, filed Apr. 14, 1999.

"NetGravity Announces New Internet Marketing Service for Advertising Agencies; Secures Top Ad Spenders as Initial Customers"; PR Newswire; Jan. 25, 1999.

Langheinrich et al.; "Unintrusive Customization Techniques for Web Advertising"; Computer Networks; pp. 1259-1272; 1999.

"MatchLogic Launches Intelligent Targeting Service", internetnews.com; (found at www.clickz.com/news/article.php/12001); Oct. 7, 1998.

Chang et al.; "Goodies'in Exchange for Consumer Information on the Internet: The Economics and Issues"; in "Internet and the Digital Economy Track"; Proc. 31st Annual Hawaii Int'l. Conference on System Sciences; vol. IV; 1998.

"Online Marketers Continue To Milk Cookies Despite Resistance from Privacy Advocates"; Interactive PR, vol. 3, No. 5, Mar. 10, 1997.

Engage Technologies, Inc.; Form S-1A; filed with SEC; pp. 36-50; Jul. 19, 1999.

Battelle, John; "The Search—How Google and Its Rivals Rewrote the Rules of Business and Transformed Our Culture"; pp. 167-171; 2005.

(56)          **References Cited**

OTHER PUBLICATIONS

Adshare Concepts (www.newshare.com, 1996, as per Archive.org).
NetGravity Products, AdServer 3.0; found at: http://web.archive.
org/web/19980525232730/www.netgravity.com/products; May 25,
1998.
Gupta, A. and Baehr, G.; "Ad Insertion at Proxies to Improve Cache
Hit Rates"; 4th International Web Caching Workshop; 1999.
Procurement and Trafficking Agreement between LookSmart Ltd.
and DoubleClick Inc.; available at http://contracts.onecle.com/
looksmart/doubleclick.svc.1997.09.24.shtml; Sep. 24, 1997.
Yahoo press release; "Yahoo! and Ziff-Davis Establish Web-Driven
Publishing Model"; PR Newswire; Dec. 12, 1995.
Ad Missle, https://web.archive.org/web/20000510065400/http://
www.netzero.com/advertisements/target_missile.html, archived May
10, 2000.
Affinity Targeting, https://web.archive.org/web/20000510211818/
http://www.netzero.com/advertisements/target_affinity.html, archived
May 10, 2000.
baseview.com website (ClassManagerPro) from www.archive.org,
archived Jan. 16, 1997.
Boomerang, https://web.archive.org/web/20000815064513/http://
www.doubleclick.net:8080/advertisers/network/boomerang/, archived
Aug. 15, 2000.
Commercialization of the World Wide Web: The Role of Cookies,
https://web.archive.org/web/19970201010942/http://www2000.ogsm.
vanderbilt.edu/cb3/mgt565a/group5/paper.group5.paper2.htm, archived
Feb. 1, 1997.
Contact Management, http://web.archive.org/web/20000413121855/
http://matchlogic.com/solutions/a_product.htm, archived Apr. 13,
2000.
How it Works, https://web.archive.org/web/20000815233141/http://
www.doubleclick.net:8080/advertisers/network/boomerang/how_it_
works.htm, archived Aug. 15, 2000.
Precision Targeting: Presenting the World's Most Relevant Adver-
tising, https://web.archive.org/web/20000510025941/http://www.
netzero.com/advertisements/advertisers.html, archived May 10, 2000.
Run of Service, https://web.archive.org/web/20000510215059/http://
www.netzero.com/advertisements/target_run.html, archived May 5,
2000.
S-1/A SEC Filing, filed by FlyCast Communications Corporation on
Apr. 30, 1999 Sites & Services : HitBox Fact Sheet, https://web.
archive.org/web/20000510100739/http://www.websidestory.com/
content.cfm?Pg=2&LinkID=5, archived May 10, 2000.
Target Shield, https://web.archive.org/web/20000510080600/http://
www.netzero.com/advertisements/target_shield.html, archived May
10, 2000.
The ZeroPort 'Speed Dial for the Web,' https://web.archive.org/
web/20000510092801/http://www.netzero.com/advertisements/z_
overview.html, archived May 10, 2000.
24/7 RealMedia, The Science of Digital Marketing: Company
Overview (2007).
aaddzz.com webpages from www.archive.org, archived Jan. 30,
1998.
AdForce, Inc., User Guide: A Complete Guide to AdForce, Version
2.6 (1998).
Fawcett, Adrienne W., Publishers thankful but nervous about boom:
Magazinedotcom: Hot spending boost . . . , adage.com, Nov. 1,
1999.
Hot spending boosts . . . , adage.com, Nov. 1, 1999.
Mand, Adrienne, Fruitful Loop: Online Ad Firms Offer New Prod-
ucts, Adweek, Oct. 5, 1998.
Ad-Star.com website archive from www.archive.org, archived on
Feb. 1, 1997 and Apr. 12, 1997.
Chang et al., "Goodies" in exchange for Consumer Information on
the Internet: The Economics and Issues, Proceedings of the Thiry-
First Annual Hawaii International Conference on System Sciences
(1998).
avenuea.com webpage, FAQ, www.avenuea.com/corpinfo/faq/
html, archived Oct. 2, 1999.

Advertising—A Unified Approach to Adverstising Management,
Baseview Products, Inc. brochure, Oct. 14, 1999.
Ribeiro-Neto et al., Extracting Semi-Structured Data Through Examples,
Proceedings of the Eight international Conference on Information
and Knowledge Management (1999).
Raskutti and Beitz, Acquiring Customer Preferences for Informa-
tion Filtering: a Heuristic-Statistical Approach, Fifth Annual Con-
ference on User Modeling (1996).
Broder, Alan J., Data Mining, the Internet, and Privacy,
WEBKDD'99 , LNAI 1836, pp. 56-73 (2000).
Brown Tracking WWW Users: Experience from the Design of
HyperVisVR, Proceedings WebNet '96 (Nov. 1996).
AdKnowledge, Campaign Manager-Quick Reference Card (1996).
Emert, 2 Web Ad Firms Decide to Marry: Palo Alto'sFocalink,
ClickOver Merging, San Francisco Chronicle, Nov. 17, 1997.
Conan et al., Legal Issues for Personalised Advertising on Internet:
The AIMedia Case Study, AMEC'99, LNAI 1788, pp. 40-67 (2000).
Elderbrock & Borwankar, Building Successful Internet Businesses,
IDG Worldwide, 1996.
Schumann & Thorson, Advertising and the World Wide Web,
Lawrence Erlbaum Associates (1999).
Williamson, Debra Aho, Web ads mark 2nd birthday with decisive
issues ahead, adage.com, Oct. 21, 1996.
Williamson, Debra Aho, Targeting distinguishes AdForce from the
pack, adage.com, Mar. 1, 1999.
Doubleclick.com webpages from www.archived.org, archived Feb.
5, 1998.
Tittel et al., Foundations of World Wide Web Programming with
HTML & CGI, IDG Books Worldwide (1995).
Fox, Susannah, Trust and privacy online: Why Americans want to
rewrite the rules, The Internet Life Report, Aug. 20, 2000.
Gehrke et al., Determinants of Successful Website Design: Relative
Importance and Recommendations for Effectiveness, Proceedings
of the 32nd Hawaii International Conference on System Sciences
(1999).
Goldman et al., Understanding Internet Co-Branding Deals, Santa
Clara High Technology Law Journal, vol. 16, Issue 1 , Jan. 2000.
Graham, Ian S., HTML Sourcebook: A Complete Guide to HTML,
John Wiley & Sons (1995).
In the Matter of DoubleClick Inc., Complaint and Request for
Injunction, Request for Investigation and other Relief, Federal
Trade Commission, Feb. 10, 2000.
Aaddzz Brochure, Information Access Technologies, Inc. (1997).
Gilbert, Special Report: Agencies centralize Web ad serving, adage.
com, Mar. 1, 1999.
Palmer & Eriksen, Digital Newspapers Explore Marketing on the
Internet, Communications of the ACM, vol. 42, No. 9, Sep. 1999.
Angwin, Julia, Focalink Will Monitor World of Online Ads, San
Francisco Chronicle, Feb. 7, 1996.
Gallagher & Parsons, A Framework for Targeting Banner Adver-
tising on the Internet, Proceedings of the Thirtieth Hawaii Interna-
tional Conference on System Sciences, Jan. 1997.
Cleland, Kim, Accipiter latest entrant in race to manage ads,
company sets sights on helping content providers target audience,
Adage.com, Sep. 9, 1996.
Cleland, Kim, New Player joins fray of Web ad targeters, adage.
com, Feb. 24, 1997.
Bayne, Kim M., AdKnowledge rolls out Web ad evaluation tool,
adage.com, Jul. 8, 1999.
Kiyomitsu, An E-Commerce technology: Web Personalization on
the Patron Web, Kobe University Economic Review 46 (2000).
Langheinrich et al., Unintrusive Customization Techniques for Web
Advertising, Computer Networks 31, 1259-1272, May 1999.
Maekawa et al., A Java-Based Information Browsing System in a
Remote Display Environment, IEEE (2004).
Meeker, Mary, The Internet Advertising Report, Harper Business,
1997.
Mobasher et al., Automatic personalization based on Web usage
mining, Communications of the ACM, vol. 43 Issue 8, pp. 142-151,
Aug. 2000.
Mobasher et al., Discovery of Aggregate Usage Profiles for Web
Personalization, Aug. 20, 2000.

(56) **References Cited**

OTHER PUBLICATIONS

Moukheiber, Zina, DoubleClick is watching, Forbes, Nov. 4, 1996.

Yeager & McGrath, Web Server Technology: The advance Guide for World Wide Web Information Providers, Morgan Kaufmann Publishers (1996).

Net.Genesis & Devra Hall, Build a Website: The Programmer's Guide to Creating, Building, and Maintaining a Web Presence, Prima Publishing (1995).

NetGravity Launches AdServer 3.5 with Beefed Up Targeting, clikz.com, Sep. 10, 1998.

New Engage ECHO Remarketing Solution Aimed at Decreasing Customer Acquisition Costs, Improving Customer Retention, Business Wire, Sep. 25, 2000.

Novak & Hoffman, New Metrics for New Media: Toward the Development of Web Measurement Standards, Project 2000: elab. vanderbilt.edu, Sep. 26, 1996.

RealMedia.com webpages, www.archive.org, archived on May 15, 19977 and Jun. 7, 1997.

Bruner, Rick E., Interactive: NetGravity to launch new ad service bureau, adage.com Dec. 1, 1997.

Bruner, Rick E., Small networks chase per-click ad business: Aaddzz, ValueClick compete, Advertising Age, Sep. 8, 1997.

Zeff & Aronson, Advertising on the Internet, 1st Edition, John Wiley & Sons (1997).

Zeff & Aronson, Advertising on the Internet, 2nd Edition, John Wiley & Sons (1999).

Rothenberg, Randall, An Advertising Power, but Just What Does Doubleclick Do?, NY Times, Sep. 22, 1999.

Snyder, Beth, Doubleclick Forms Consumers-Tracking Unit Closed Loop Aims to Enhance 1-to-1 Marketing, Advertising Age.69.40, Oct. 5, 1998.

Singh & Dalal, Web Home Pages as Advertisements, Communications of the ACM, Aug. 1999.

The ClickZ Network, Netscape Selects Real Media's Open AdStream, Jan. 13, 1998.

The ClickZ Network, Real Media Signs More Media Companies, Dec. 30, 1998.

www.Spinbox.com webpages, www.archive.org, archived beginning Nov. 11, 1998.

Bakos, The Emerging Role of Electronic Marketplaces on the Internet, Communications of the ACM, vol. 41, No. 8, Aug. 1998.

Kohda & Endo, Ubiquitous Advertising on the WWW: Merging Advertisement on the Browser, Fifth International World Wide Web Conference, May 6-10, 1996).

AdForce, Inc., Quick Reference Guide, Version 3.0 (1999).

AdManagerPro, Ad Entry Manual, User's Manual V.1.05, 1997.

AdManagerPro, Ad Entry Manual. User's Manual V.2.0, 1997.

AdManagerPro, Administration and Receivables Manual, Administrator's Manual Version 1.0.5, Nov. 1997.

AdManagerPro, Administration and Receivables Manual, Administrator's Manual Version 2.0, Jun. 1998.

Baseview.com webpages from www.archive.org, archived Jan. 16, 1997.

Commercialization of the World Wide Web: The Role of Cookies, vanderbilt.edu web pages, archive.org, Feb. 1, 1997.

Crabtree et al., Adaptive Personal Agents, Personal Technologies (1998).

Dalton, Gregory, OPS: Answer to Cookies?, InformationWeek, Oct. 13, 1997.

Dunn et al., Privacy and Profiling on the Web, Submitted to W3C on Jun. 2, 1997.

firefly.com web pages, archive.org, 1998-2000.

Gilbert, Jennifer, CMGI's Web dealmaking hits big-time, Advertising Age, Oct. 4, 1999.

Hersley et al., Implementation of OPS Over HTTP, Submitted to W3C on Jun. 2, 1997.

Hersley et al., Proposal for an Open Profiling Standard, Submitted to W3C on Jun. 2, 1997.

Hersley et al., Standard Practices of OPS Systems, Submitted to W3C on Jun. 2, 1997.

junkbusters.com web pages, archive.org, archived Apr. 1997 through Nov. 2000.

Karpinski, Richard, ICE application to revolutionize e-commerce, Business Marketing, Mar. 1998.

matchlogic.com web pages, archive.org, archived Apr. 13, 2000.

Roscheisen, R. Martin, A Network-Centric Design for Relationship-Based Rights Management (Dissertation), Dec. 1997.

Kristol, D. & Montulli, L.; HTTP State Management Mechanism, Internet Engineering Task Force; available at https://tools.ietf.org/html/rfc2109; Feb. 1997.

Berners-Lee, Tim; Information Management: A Proposal; CERN; available at http://www.w3.org/History/1989/proposal.html; May 1990.

Berners-Lee, Tim; Uniform Resource Locators (URL), A Syntax for the Expression of Access Information of Objects on the Networkl Internet Engineering Task Force; available at http://www.w3.org/Addressing/URL/url-spec.txt; Mar. 21, 1994.

Berners-Lee, Tim; The Original HTTP as defined in 1991, W3C; available at http://www.w3.org/Protocols/HTTP/AsImplemented.html (1991).

Berners-Lee, Tim, et al.; Hypertext Transfer Protocol—HTTP/1.0; Network Working Group Request for Comments: 1945; Internet Engineering Task Force1; available at https://tools.ietf.org/html/rfc1945; May 1996.

Barry M. Leiner et al.; Brief History of the Internet; Internet Society; Oct. 15, 2012.

Berners-Lee, T. & Connolly, D.; Hypertext Markup Language—2.0; Network Working Group Request for Comments: 1866; Internet Engineering Task Force; available at https://tools.ietf.org/html/rfc1866; Nov. 1995.

Tungate, Mark; Adland—A Global History of Advertising, 2d Ed. (2013).

Johnson, Bradley; Interactive; Planet Oasis Gives Web Sites Promotion Clout; Advertising Age; available at http://adage.com/article/news/interactive-planet-oasis-web-sites-promotion-clout/78467; Jul. 8, 1996.

Jones, Duncan; The History of Pay Per Click (PPC) Marketing; Online Marketing Bog (www.duncanjonesnz.com) available at https://www.duncanjonesnz.com/history-of-ppc-marketing; Sep. 23, 2014.

Samar, Vipin; Single Sign-on Using Cookies for Web Applications; WET ICE⇐99 Jun. 16-18, 1999.

Yahoo's Invalidity Contentions (pages related to parent patents in this family); *AlmondNet, Inc. et al. v. Yahoo? Inc.*, Civil Action No. 16-cv-1557-ILG-SMG, U.S. District Court for the Eastern District of New York; Jun. 30, 2017.

Exhibits B-1 through B-9 (as revised) of Yahoo's Invalidty Contentions; Jun. 30, 2017 and Aug. 22, 2017.

* cited by examiner



Figure 1



Figure 2



Figure 3

Figure 4

Figure 5

Figure 6

Figure 7

# METHODS AND APPARATUS FOR FACILITATED OFF-SITE TARGETED INTERNET ADVERTISING

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 14/091,285, filed Nov. 26, 2013, now U.S. Pat. No. 10,026, 100, which is a division of application Ser. No. 13/585,765, filed Aug. 14, 2012, now U.S. Pat. No. 8,600,815, which is a division of application Ser. No. 13/368,686, filed Feb. 8, 2012, now U.S. Pat. No. 8,244,586, which is a division of application Ser. No. 12/911,601, filed Oct. 25, 2010, now abandoned, which is a continuation of application Ser. No. 10/996,491, filed Nov. 24, 2004, now U.S. Pat. No. 7,822, 639, which is a continuation of application Ser. No. 09/723, 391, filed Nov. 28, 2000, now U.S. Pat. No. 6,832,207. The disclosures of said application and its entire file wrapper (including all prior art references cited therewith) are hereby specifically incorporated herein by reference in their entirety as if set forth fully herein. Furthermore, a portion of the disclosure of this patent document contains material that is subject to copyright protection. The copyright owner has no objection to the facsimile reproduction by anyone of the patent document or the patent disclosure, as it appears in the Patent and Trademark Office patent file or records, but otherwise reserves all copyright rights whatsoever.

## FIELD OF THE INVENTION

The present invention generally relates to a method for distributing information-media contents. More specifically, the present invention relates to expanding the revenue from information capacity of the media.

## BACKGROUND OF THE INVENTION

Data communications systems have evolved from simple methods of conveying information. In ancient times messages were carried by word of mouth. Later, messengers on foot carried hand-carved messages on stone tablets. This further evolved, as handwriting developed, to handwritten messages on papyrus, leather and then paper carried by foot messengers and later by messengers on horseback. Already, in those early times, there was a natural limit to the amount of information that any one messenger could carry.

The advent of manual signaling from hilltop to hilltop was followed, with the arrival of electricity on the communication scene, by the electric telegraph. The amount of information that could be conveyed took a quantum leap forward. Again, there was a natural limit to the amount of information that could be carried by this new medium. At the turn of the last century, radio made its first tentative appearance on the communication scene. The flow of information seemed to have taken another quantum leap forward.

In the middle of the last century, with the advent of the first computers and television, the communication age seems to have finally burst through all the limits of previous millennia. The past decade saw increases in the flow of information facilitated by developments of the Internet, cellular telephones and various wireless communication devises. All these have apparently broken prior historic limits to the flow of information. However, this is not the case. Another limit has become apparent, namely the limit of human capacity to peruse this vast flow of information to the point of saturation.

An additional problem has also become apparent with the growth of the Internet and other data communication systems. Communication media are also being used for another purpose, in parallel with transmitting core information. This is the transmission of special messages alongside the core information. Special messages include advertisements, notifications, legal notices, credit warnings and a host of other items. These messages are both single directional or interactive between sender and targeted recipient.

Generally, special messages are carried in a number of media. For example, advertisements are included in newspapers and magazines, on Internet Web sites, over cellular telephone media, radio, television and many others. The amount and proportion of such special messages that can be carried in a media is limited by a number of factors. These include aesthetic, physical and financial considerations. It would seem that these limiting factors may be expressed as the ratio of the amount of special messages to the quantity of core information. When the proportion of non-core information reaches a point of unacceptability to a viewer or reader, this point is termed saturation. Even for a media predicated on 100% special messages, there is a physical upper limit.

Typically, in an Internet Web site, it has become commonplace to have a variety of special messages. These typically include advertisements with or without hyperlinking to other Web sites or other Web pages. In much the same way, magazines and newspapers carry special text and graphic messages in the form of advertisements, legal notices and so on. Again, there is an upper limit, even for print media predicated on 100% special messages.

Either due to physical limitations or due to reaching an unacceptable ratio of special messages to core information, media reach the point of being unable to carry additional special messages. This saturation represents a financially limiting problem to that media after a popular media has a waiting list of advertisement orders. For this reason, many methods are used to try to extend this saturation point, for example, by using hyperlinks on a Web site, by adding supplements to newspapers or magazines, by adding special message supplements to credit card billing and many others. These techniques merely appear to delay the onset of saturation and is often rather ineffective. In some cases, it is undesirable, for financial considerations, to extend the physical size of the media. Therefore, a magazine may be limited to a specific number of pages and a Web site to a specific number of web pages. Equally, it is vital that aesthetics of any media be taken into consideration so that readers or viewers are not overwhelmed with the multiplicity and density of information represented by such saturation, making a media appear unfriendly and overwhelming. There is, then, a need for a method to reach beyond this point of saturation in a media.

### Advantages, Objects and Benefits of the Invention

#### Technical Issues

The natural limitation to the quantity of special messages that may be applied to a data communication media is itself not a technical problem but rather one of financial, aesthetic and pragmatic considerations. However, the present invention provides a very technical solution to the saturation of many communication media. In essence, the present invention provides a solution by avoiding the characteristics causing saturation. This solution is achieved by making an

alternative site in the same or an alternative media available for additional special messages, generally using existing modules and technology.

## Ergonomic Issues

Viewing a magazine that is supposed to be informative, but consists of a disproportionate amount of advertisements and other notices, is highly irritating. Viewing an Internet Web site for specific information only to find that it consists of advertisements, notices, warnings and other messages is no less problematic. Apart from the financial and physical implications, there is also a significant aesthetic problem. In general, communication media exist for reasons of economics. Finding a media that is aesthetically displeasing or too packed with information extraneous to the core information, will ultimately result in a loss of visitors to the site or readers to buy a magazine. The present invention addresses both the aesthetic problem and loss of revenue by a media site unable to accommodate additional special messages. Another important aspect of the present invention relates to using generally existing, known modules and technology, making implementation transparent. Also, sales persons will require no special or additional training in the techniques involved.

## Economic Issues

Imagine having sold all the available advertising space in a magazine and then receiving inquiries for additional advertising space. This is the essence of the financial problem addressed by the present invention—particularly in the context of electronic media such as Internet. Selling additional advertising space accessible in an alternative site or data communication media, even at a somewhat reduced price, represents a significant financial advantage to the magazine or broadcaster site. The present invention, by making additional space available, either at an alternative site or in an alternative media, provides an innovative and very financially attractive solution generally using existing modules and technology in an unobvious way. Revenue from this resource would not ordinarily have accrued to the original advertising media site without having an alternative to an otherwise fully subscribed advertising site.

Moreover, a web site or magazine realize that no matter how big it is, the traffic to an aggregate of sites is always bigger than the traffic to one site and on a personal level, the number of pages seen by a reader of a web site within the web site is usually smaller than the number of the pages the web site reader reads elsewhere. Due to the aforementioned a web site with 20% of sold ad space and 80% unsold ad space might prefer to let its advertisers reach its audience outside of its web site in return for a lower price than lowering its price within the site and the reasons are clear, the number of pages the visitor will read outside the site are bigger than the number of pages the reader will read within the site and therefore it is preferable to the web site to sell its advertisers the visitor to its web site outside its site for a lesser site though but for a bigger number of exposures. Selling the visitor to its advertiser while not within the site (OUT OF CONTEXT ad) enables the site to reduce price without devaluing its relationships with the advertisers on the site it self.

## Notices

The present invention will forthwith be described with a certain degree of particularity, however those versed in the

art will readily appreciate that various modifications and alterations may be carried out without departing from either the spirit or scope, as hereinafter claimed.

In describing the present invention, explanations are presented in light of currently accepted data communications theories and media models. Such theories and models are subject to changes, both adiabatic and radical. Often these changes occur because representations for fundamental component elements are innovated, because new transformations between these elements are conceived, or because new interpretations arise for these elements or for their transformations. Therefore, it is important to note that the present invention relates to specific technological actualization in embodiments. Accordingly, theory or model dependent explanations herein, related to these embodiments, are presented for the purpose of teaching, the current man of the art or the current team of the art, how these embodiments may be substantially realized in practice. Alternative or equivalent explanations for these embodiments may neither deny nor alter their realization.

Furthermore, in most instances in the context of the present invention, an example of a facilitation is an offer; in other instances, a facilitation is appreciated to include performance of an activity or an acceptance—as will forthwith be further appreciated by examples provided in the following Glossary.

## Glossary

Broadcaster: A broadcaster is a participant in a distribution of electronic signals—be they digital signals, analog signals, or the likes. For example, in the context of the Internet, a broadcaster is preferably a media owner. In the broad context of interactive bi-directional electronic communications, a broadcaster is a predetermined party in a transmission path from a present communications initiator to a present designated recipient—for example a telephone call initiator, any repeater in the interconnection of that call to the recipient, or the recipient. Furthermore, in the context of today's hybrid electronic media, a broadcaster may be a programmable component that can be inserted into the caller to recipient path.

Conjunction: In the context of the present invention, the expression "in conjunction" relates to a division of work between parties, such as between an agency and a broadcaster. This division may be of any proportion—so long as a nominal task remains for one of the parties to accomplish. In some circumstances, there is a definite preference for the division of labor to have a specific predefined asymmetry, while in other circumstances the division may occur using a simple easy to accomplish criteria. Furthermore, sometimes there is a specific bias as to which party performs some specific aspect of the conjunctive task, for example, according to a concern to preserve privacy, etc.

Cookie: A Cookie is a message given to a Web browser by a Web server. The browser stores the message in a text file called cookie.txt or a cookie directory or the likes. The message is then sent back to the server each time the browser requests a page from the server. Cookies serve as recognition symbols or messages in a particular Web browser that can be recognized and acted upon by that cookie placing Web server.

Offsite Content: In the context of the present invention, offsite content is content that derived from outside of the immediate local context of a present site. For example, on an Internet page, an offsite content may be a banner or may substantially be the result of clicking on a hyperlink to

another page (be it in the same internet site or in another internet site)—especially when the hyper link is to outside of the current page. In the context of a telephone conversation between two parties, a audio time pulse placed by the telephone service provider is also an example of an offsite content. Likewise, "piped in" background music that a caller hears when waiting for his call to be transferred is an example of an offsite content.

Super-saturation: In the context of the present invention, the term Saturation simplistically describes a situation where a data communication media site contains a maximum predetermined amount of content presentation apart from core information. This content presentation may be in the form of advertisements, notifications and other information not directly associated with core data. Maximum amount of content presentation is limited by physical, aesthetic and pragmatic factors. Exceeding this saturation level leads to the state of out of context media fulfillment, that is, containing more content presentation than is desirable, pragmatic, physically possible or aesthetically pleasing.

Alternatively, in the context of the present invention, a more pragmatic definition for the term Saturation relates to a current level of predetermined content in a specific media instance; for example a web site currently has sold 20% of the space that it has allocated for advertising. In the nomenclature of the present invention, this represents a level of actual saturation of 20% of available in context advertising potential. The present invention generally relates to a super-saturation method whereby a new revenue stream is created by facilitating out of context potential (for advertising or otherwise) that is in excess of any actual saturation—be it 20% as in the pragmatic example or be it 100% as in the prior simplistic example.

Simply stated, super-saturation relates to facilitating out of context placement of content, and this placement is by definition in addition to the saturation of the in context material—regardless of the level of in context materials.

SIM Card: This is a Subscriber Identity Module card that is commonly inserted into a cellular telephone.

Tagging: Tagging relates to an identification that reveals that the tagged visitor is known to have been at a predetermined information media, such as an internet site or a specific internet page, or have dialed up to a specific telephone number, etc. The tag need not contain any information that identifies the visitor nor need it contain any information that allows the visitor to be profiled. A tag simply identifies that its bearer was so marked for having been at a specific location, or for having been there for a predetermined amount of time, or for having conducted some specific action there, etc.

## SUMMARY OF THE INVENTION

The present invention relates to a super-saturation method for information-media, whereby a second broadcaster in conjunction with an agency extends a content presentation of a first broadcaster beyond a predetermined information-media saturation threshold for content presentation of the first broadcaster, the method including the steps of:

   a) an agency facilitating visitor identification; (note: in the context of the present invention "an agency" is a service facilitator)

   b) in conjunction with the agency, a first broadcaster of the first information-media tagging a preponderance of visitors to the first information-media with a tag; and

   c) in conjunction with the agency, a second broadcaster of a second information-media recognizing a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first broadcaster—the second broadcaster accepting the offsite content presentation for the recognized visitor.

For a combination of financial and pragmatic considerations, it is a sine qua non that commercial Web sites and other data communication media, in presenting a variety of core information to viewers, readers or listeners, also insert an amount of non-core special message information. Special messages include advertisements, legal instruments, credit warnings and notifications, to name but a few. These special messages take the form of single directional informative messages or as interactive information directed at specific targeted clients.

It is obviously in the best interest of a proprietor of these media, to place as much and as many special messages into each media presentation as possible, since this is a prime and significant source of revenue. However, there is a natural limitation to the quantity of special messages that may be applied to a data communication media. This limitation, described as saturation, is not itself a technical problem but rather one of financial, aesthetic and pragmatic considerations.

A media may reach this saturation level due to pragmatic considerations such as limited physical size or space. In addition, saturation may occur due to a requirement to limit the cost of a producing a Web site, magazine, newspaper or other media application. In general, providers of core information need to provide a service that has an aesthetic appeal to targeted client viewers, readers or listeners. By insertion of excessive amounts of special messages and consequent over-saturation of a media site, targeted clients will find the sheer volume of data too overwhelming and difficult to maintain interest and to absorb.

In addition, it is financially and from customer relationship point of view, undesirable to turn away clients who are willing to pay for insertion of special messages. In order to limit the amount of added special messages in a data communication media, while still not turning away requests for insertion of special messages, an alternative is needed. This alternative allows the Web site or other media to gain financially and still maintain customer confidence by applying a technique of super-saturation. The present invention provides a solution to this difficulty.

Ordinarily, each media broadcaster has a targeted client base, to which core information is directed. Targeted client bases are related, for example, to income level, profession, age, sex or field of interest, to name a few. In general, special messages are directed to the particular targeted client base of a media broadcaster.

Simply stated, when a media reaches special message saturation, in regard to the present invention, an agency or a second broadcaster is utilized to extend a special special content presentation through the use of a second, alternative information-media broadcaster. A special message, prepared at the direction of an agency by the first saturated media broadcaster are placed into the media of a second broadcaster. This special message presentation is for presentation to substantially the same targeted client base but on an off-site basis at another site servicing substantially the same client base.

To each this client base, an arrangement is entered into by the first broadcaster in conjunction with the agency, so that substantially all clients visiting the first broadcaster are

tagged. This tag is recognized when a tagged visitor requests a visit to the second broadcaster site. Recognition of such a tag gives rise, in conjunction with the agency or in conjunction with the first broadcaster, to a number of possibilities. For example, in an Internet situation, the visitor is presented with the first broadcaster's special message. Alternatively, the visitor is caused to fetch a special message. Similarly, this special message is placed into a cellular Subscriber Identity Module (SIM) card database, and targeted at a client base, appropriate to the first broadcaster. Another possibility is the use a telephone system data base.

The present invention also relates to a contracting structure for facilitating super-saturation of an information-media, whereby a second information-media broadcaster in conjunction with an agency extends a content presentation of a first broadcaster beyond a predetermined information-media saturation threshold for content presentation of the first broadcaster, the contracting structure including:

a) a first contractual agreement between an agency offering an offsite content presentation for a first information-media and a content provider accepting said offering;

   i) whereby the agency provides a facilitated delivery of a content of the first content provider to an identified visitor visiting offsite; and

   ii) whereby the content provider pays for the facilitated delivery;

b) a second contractual agreement between the agency and a first broadcaster of the first information-media;

   i) whereby the first broadcaster provides a facilitated tagging of a preponderance of visitors to the first information-media; and

   ii) whereby the agency provides a facilitated offsite placement of a content deriving from the first contractual agreement, the agency paying the first broadcaster for substantially each such facilitated placement; and

c) a third contractual agreement between the agency and a second broadcaster of a second information-media;

   i) whereby the second broadcaster provides a facilitated recognizing of a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first broadcaster—the second broadcaster provides a facilitated accepting the offsite content presentation for the recognized visitor; and

   ii) whereby the agency pays for the facilitated delivery accepting.

Simply stated, the basis for this contracting structure is that a first broadcaster has reached a point of special message saturation. Another broadcaster in a second information-media, in conjunction with an agency, extends a special message content presentation on behalf of the first broadcaster. Therefore, the first broadcaster, in effect, reaches a content presentation beyond a predetermined information-media saturation threshold, or a state of super-saturation.

A contracting structure in terms of the present invention, consists of three separate contracts. A first contractual agreement is between an agency offering, for example, to an advertiser or a credit card organization, respectively, an insertion of an advertisement or a credit warning into an offsite media. This offer arises as a result of a first broadcaster being unable to accommodate additional insertions, that is, being at a point of saturation. The agency includes, in terms of this contract, a provision for delivering the

inserted item to an identified offsite visitor. The advertiser pays the agent for this service.

A second contract is between the agency and a first broadcaster; in this case, the broadcaster that has reached saturation point, for insertion of additional items. The first broadcaster thus reaches a situation described by the present invention as super-saturation. The broadcaster agrees to provide tagging of substantially all visitors to this first media site. Further, the agency agrees to provide an alternative site for facilitating identified visitors from the first broadcaster site receiving the inserted item on visiting the second site. The agency pays the first broadcaster in terms off this contractual arrangement.

Finally, the agency enters into a third contract with a second broadcaster. In terms of this contract, in conjunction with either the agency or the first broadcaster, the second broadcaster provides a procedure for recognizing a tagged visitor to the second media. This procedure includes the visitor accepting the offsite presentation item. The agency pays the second broadcaster for accepting this item.

In terms of these three contracts, the first broadcaster benefits from selling a placement of an advertisement, a notification or other insertion into an alternative site. In spite of the first broadcaster being at a saturation point, by providing tagging of visitors to this first site, the first broadcaster provides the advertiser with a preponderance of first site visitors. These visitors are able to receive this message item at another appropriate site. The agency pays the second broadcaster for placing insertions on behalf of the advertiser for acceptance by visitors tagged at the first site. The advertiser benefits by having an advertisement, albeit at the second site, nevertheless targeted at visitors to the saturated first broadcaster site. The net proceeds from these contracts, of course, will accrue to the agency, which has acted as a facilitator and coordinator in terms of the contracts for this super-saturation method.

Typically, a web site sales force will sell access to its audience via offsite content because no one knows better than a web site sales force, how to sell to their own audience. An agency will merely act as a facilitator that will charge a percentage or a fee for a transaction for finding the audience elsewhere. A second site where the visitor will be found will rent its unsold space for a fixed fee or for a percentage of the transaction as well.

It should be noted that privacy is a huge issue that is substantially addressed by embodiments of the present invention. The second site need not even know where the audience of the first site is found nor that it is the first site that sold its space as an offsite space. The second site merely rents unsold space for an unknown visitor in return for a fee received from an agency and not the other site. The fact that an advertisement on behalf of site X advertiser is shown to the visitor while he is on site Y is of no consequence. Site X simply sold the space as offsite space to their advertiser. Site X does not know on which web site was their visitor found and they don't care as long as it is not a porn site or another site that belongs to a category that either Site X or their Advertiser is not interested in. Site X reports to its advertiser just that its ad was shown to Site X visitor on another site. In this embodiment none of the parties learns new information about the visitor. Site X and its advertiser do not know at what web site was Site X visitor found. The site where the Site X visitor is found does not know that it is a Site X visitor, just that an unsold space of its was sold by another anonymous site and that in return for renting its own space to the other anonymous site it is receiving from the agency a fee.

## BRIEF DESCRIPTION OF THE FIGURES

In order to understand the invention and to see how it may be carried out in practice, embodiments will now be described, by way of non-limiting example only, with reference to the accompanying drawings, in which:

FIG. **1** illustrates a schematic view of a super-saturation method for information-media;

FIG. **2** illustrates a schematic view of a first contractual agreement;

FIG. **3** illustrates a schematic view of a second contractual arrangement;

FIG. **4** illustrates a schematic view relating to a first broadcaster providing a facilitated tagging of a preponderance of visitors to the first information-media;

FIG. **5** illustrates a schematic view relating to an agency **502** providing a facilitated offsite placement of a content deriving from the first contractual agreement, the agency paying the first broadcaster;

FIG. **6** illustrates a schematic view relating to a third contractual agreement; and

FIG. **7** illustrates a schematic view relating to details of the third contractual agreement.

## DETAILED DESCRIPTION OF THE INVENTION

At the present, there is a vast flow of information. This occurs as a result of the growth and development of a number of data communication media. Although this has made information available literally at the press of a button, the limit of human capacity is becoming apparent.

An additional problem has also become apparent with the growth of the Internet and other data communication systems. Communication media are also used for another purpose, in parallel with transmitting core information, using data communication media. This purpose is the transmission of special messages alongside core information. Special messages include advertisements, notifications, legal notices, credit warnings and a host of other items. These messages are both single directional and interactive between sender and targeted recipients.

Typically, in Internet Web sites, it has become commonplace to have a variety of special messages. These include advertisements with or without hyper-linking to other Web sites or other Web pages, warnings, legal notices and credit control notices and a host of others. Similarly, cellular telephones SIM cards carry text and audio special messages. In addition, credit card databases carry credit warning messages and telephone system databases carry audio and text messages and warnings. In much the same way, magazines and newspapers carry special text and graphic messages in the form of advertisements, legal notices and so on.

The amount and proportion of such special messages that can be carried in a media site is limited by aesthetic, physical and financial considerations. These considerations may be expressed as the ratio of the amount of non-core special message information to the quantity of core information. When the proportion of non-core information reaches a point of unacceptability to a viewer, listener or reader, this point is termed saturation.

This saturation is financially limiting to media. Many methods are used to extend this saturation point, for example, by using hyperlinks on a Web site, by adding supplements to newspapers or magazines, by adding special message supplements to credit card billing and many others.

These techniques merely appear to delay the onset of saturation but are often ineffective.

In some situations, for financial considerations, it is impractical to extend the physical size of media sites. Therefore, a magazine may be limited to a specific number of pages and a Web site to a specific number of Web pages.

Equally, aesthetics of any media site have to be taken into consideration. Readers, listeners or viewers must not overwhelmed with the multiplicity and density of information represented by over-saturation. This makes a media appear unfriendly and overwhelming. There is, then, a need for a method to reach beyond this point of saturation in a media without creating over-saturation.

Turning to FIG. **1**, illustrating a schematic view **100** of the steps of a super-saturation method for information-media.

The present invention relates to a super-saturation method for information-media, whereby a second information-media broadcaster in conjunction with an agency extends a content presentation of a first broadcaster beyond a predetermined information-media saturation threshold for content presentation of the first broadcaster, the method including the steps of:

a) an agency facilitating **101** visitor identification; (note: in the context of the present invention "an agency" is a service facilitator) an agency

b) in conjunction with the agency, a first broadcaster of the first information-media tagging **102** a preponderance of visitors to the first information-media with a tag; and

c) in conjunction with the agency, a second broadcaster of a second information-media recognizing **103** a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency **104** or in conjunction with the first broadcaster **105**—the second broadcaster accepting the offsite content presentation for the recognized visitor.

It is a sine qua non that commercial Web sites and other data communication media sites, while presenting core information to specifically targeted viewers, readers or listeners, also insert as much non-core special message information as possible. After all, this is a major revenue source for a site. In addition, non-core special messages are directed at these same specifically targeted viewers, readers or listeners. A targeted group is generally defined as market related to such aspects as age, technical field, sex, profession and many others.

At a commercial site with substantive visitor traffic, there is a demand for space for special message items such as advertisements, notices and so on. If the media site arrives at a point of reaching a predetermined quantum of special message items, that is, reaches a point of saturation, clients requiring additional space for further special messages cannot be satisfied. By insertion of excessive amounts of special messages and consequent over-saturation of a media site, targeted clients will find the sheer volume of data too overwhelming and difficult to maintain interest and to absorb.

It is obviously in the best interest of a proprietor of these media, to place as much and as many special messages into each media presentation as possible, since this is a prime and significant source of revenue. Similarly, clients wishing to place special message items, have a vested interest insofar as directing, for example, advertisements for products or services, to the specifically targeted visitors to this site.

Simply stated, when a media reaches special message saturation, in regard to the present invention, an agency, in conjunction with a suitable second broadcaster, is utilized to

extend additional special message content presentation beyond saturation point. The second broadcaster site is selected specifically because this site targets a category of visitors similar to the first broadcaster site. A special message item, prepared, for example, by a client advertiser at the direction of the agency, is placed into the second broadcaster site. This special message presentation is for presentation to substantially the same targeted client base but on an off-site basis at an alternative site servicing substantially the same client base.

To reach this client base, an arrangement is entered into by the first broadcaster in conjunction with the agency. Substantially all clients visiting the first broadcaster are tagged at the instance of this broadcaster. For example, a cookie is inserted into a visitor's browser or similar tags are placed into a customer database.

Recognition of this tag occurs, in accordance with an arrangement between an agency and both first and second broadcasters, when a tagged visitor requests a visit to the second broadcaster site. Recognition of such a tag gives rise, in conjunction with the agency or in conjunction with the first broadcaster, to several possibilities. For example, in an Internet situation, a recognized visitor is presented with the first broadcaster's special message, situated in the second broadcaster. Alternatively, the visitor fetches a special message from the second broadcaster. Similarly, this special message is placed into a cellular SIM card database, targeted at a client base appropriate to the first broadcaster. Another possibility is the use a telephone system database to elicit a similar result.

The net consequence of using the method of the present invention is that all parties to this method are satisfied. The client advertiser has exposure to a targeted visitor group. The first broadcaster, in spite of being saturated with inserted message items, is able to reach a situation of super-saturation and, consequently, benefit financially. The second broadcaster receives additional revenue with the addition of special message items. Finally, the agency benefits as a result of this application of the present invention, in a role as facilitator and coordinator.

Turning now to FIGS. **2**, **3**, **4**, **5**, **6** and **7**, these illustrate schematically aspects of a contracting structure for facilitating super-saturation of an information-media.

FIG. **2** illustrates a schematic view **200** of a first contractual agreement **201**.

FIG. **3** illustrates a schematic view **300** of a second contractual arrangement **301**.

FIG. **4** illustrates a schematic view **400** relating to a first broadcaster providing **401** a facilitated tagging **402**, **403**, **404** and **405** of a preponderance of visitors **406**, **407**, **408** and **409** to the first information-media.

FIG. **5** illustrates a schematic view **500** relating to an agency **502** providing **503** a facilitated offsite placement **501** of a content deriving from the first contractual agreement, the agency paying **505** the first broadcaster **504**.

FIG. **6** illustrates a schematic view **600** relating to a third contractual agreement **601**.

Finally FIG. **7** illustrates a schematic view **700** relating to details of this third contractual agreement.

The present invention also relates to a contracting structure for facilitating super-saturation of an information-media, whereby a second broadcaster in conjunction with an agency extends a content presentation of a first broadcaster beyond a predetermined information-media saturation threshold for content presentation of the first broadcaster, the contracting structure including:

a) a first contractual agreement **201** between an agency offering **202** an offsite content presentation **203** for a first information-media and a content provider accepting **204** said offering;

    i) whereby the agency provides a facilitated delivery **205** of a content **206** of the first content provider to an identified visitor visiting **207** offsite; and

    ii) whereby the content provider pays for the facilitated delivery;

b) a second contractual agreement **301** between the agency **303** and a first broadcaster **304** of the first information-media **302**;

    i) whereby the first broadcaster **401** provides a facilitated tagging **402**, **403**, **404** and **405** of a preponderance of visitors **406**, **407**, **408** and **409** to the first information-media; and

    ii) whereby the agency **502** provides **503** a facilitated offsite placement **501** of a content deriving from the first contractual agreement, the agency paying **505** the first broadcaster **504** for substantially each such facilitated placement; and

c) a third contractual agreement **601** between the agency **602** and a second broadcaster **604** of a second information-media **603**;

    i) whereby the second broadcaster provides **701** a facilitated recognizing **702** of a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency **703** or in conjunction with the first broadcaster **704**—the second broadcaster provides a facilitated accepting **705** and **706** the offsite content presentation for the recognized visitor; and

    ii) whereby the agency pays for the facilitated delivery accepting.

Simply stated, the basis for this contracting structure is that a first broadcaster has reached a point of special message saturation. Another broadcaster in a second information-media, in conjunction with an agency, extends a special message content presentation on behalf of the first broadcaster. Therefore, the first broadcaster, in effect, reaches a content presentation beyond a predetermined information-media saturation threshold, or a state of super-saturation.

According to an embodiment of the present invention, a contracting structure consists of three separate contracts. A first contractual agreement is between an agency offering, for example, to an advertiser or a credit card organization, respectively, an insertion of an advertisement or a credit warning on an offsite media. This offer arises as a result of a first broadcaster being unable to accommodate additional insertions, that is, being at a point of saturation. The agency includes, in terms of this contract, a provision for delivering the inserted item to an identified offsite visitor. The advertiser pays the agent for this service. Furthermore, it is also conceivable that the first broadcaster is the content provider.

A second contract is between the agency and a first broadcaster; in this case, the broadcaster that has reached saturation point, for insertion of additional items. The first broadcaster thus reaches a situation described by the present invention as super-saturation. The broadcaster agrees to provide tagging of substantially all visitors to this first media site. Further, the agency agrees to provide an alternative site for facilitating identified visitors from the first broadcaster site receiving the inserted item on visiting the second site. The agency pays the first broadcaster in terms off this contractual arrangement.

Finally, the agency enters into a third contract with a second broadcaster. In terms of this contract, in conjunction with either the agency or the first broadcaster, the second broadcaster provides a procedure for recognizing a tagged visitor to the second media. This procedure includes the visitor accepting the offsite presentation item. The agency pays the second broadcaster for accepting this item.

In terms of these three contracts, the first broadcaster benefits from selling a placement of an advertisement, a notification or other insertion into an alternative site. In spite of the first broadcaster being at a saturation point, by providing tagging to visitors to this first site, the first broadcaster provides the advertiser with a preponderance of first site visitors. These visitors are able to receive this message item at another appropriate site. The agency pays the second broadcaster for placing insertions on behalf of the other site (or the advertiser) for acceptance by visitors tagged at the first site. The advertiser benefits by having an advertisement, albeit at the second site, nevertheless targeted at visitors to the saturated first broadcaster site. The net proceeds from these contracts, of course, will accrue to the agency, which has acted as a facilitator and coordinator in terms of the contracts for this super-saturation method.

As will be understood by a man of the art, the terminology in relation to Internet Web Site usage, of the phrase "Cost Per Thousand" (CPM) is used by Internet marketers to price advertising banners. Sites that sell advertising will guarantee an advertiser a certain number of impressions (number of times an advertising banner is downloaded and presumably seen by visitors.), then set a rate based on that guarantee times the CPM rate. A Web site that has a CPM rate of $25 and guarantees advertisers 600,000 impressions will charge $15,000 ($25×600) for those advertisers' advertising banner.

By way of an example of the embodiments of the present invention, in a case of a 'highly-valued' section (i.e. Financial section) of a particular site, advertisements sell for $50 CPM. Advertisement space in this section is often sold out. However, another section of that site devoted to General News sells for only $10 CPM and is usually unsold. If a user browses the Financial section and then goes to the General News section, the user will be recognized by the agency as a Financial section visitor, 'interested in Finance'. Because advertisers are willing to pay a premium to reach the 'interested in finance' person, portions of the inventory in the General News section may now be sold by the site for $35 instead of for the traditional $10.

A further example relating to the embodiments of the present invention wherein a publisher sells visitors to its lucrative/sold-out site sections to its advertisers but on other web sites, as yet not-sold-out. The as yet not-sold-out web sites rent their substantially unsold space to be sold by publishers to their own advertisers through an agency. For example, assuming that a publisher's Personal Finance section is sold out at $50 CPM. Visitors to this section will inevitably visit other content sites. The publisher's sales force, which already has the expertise to sell to the Personal Finance section audience, can now sell these Personal Finance section visitors to its own advertisers for $30 when those visitors surf other sites, thus providing the Publisher with a new revenue stream.

In this next example, a publisher's unsold space is sold by other publishers as offsite space to their own advertisers. A technology related publisher, for example, may charge $60 CPM for advertising on its web site. However, the technology related publisher could charge its advertisers $45 CPM in return for showing offsite advertisements to the publisher's regular site audience. More simply stated, the technol-

ogy related publisher will charge its advertisers $45 CPM in return for showing advertisements to its site audience while they visit other web sites.

The publisher, which in its unsold space the technology related publisher audience was found, can charge through the agency, a fixed CPM or take a percentage of the revenues from the technology related publisher that used its advertising space to serve offsite advertisements to its own audience on behalf of its advertisers.

Following these examples it is emphasized that as a publisher an important target is earn a new revenue stream without cannibalizing current revenues or devaluing currently selling advertising. Selling offsite advertisements is a significant improvement to the art. For example, selling a bundle of 10 exposures to advertisements within a site for $45 CPM and 100 exposures offsite for a $30 CPM, represents a significant revenue source.

According to an embodiment of the present invention, the super-saturation method for information-media, the agency is an advertising agency.

In this capacity, an agency provides know-how and experience in advertising and in marketing of advertising media in a variety of fields such as the Internet, radio, television and news media. According to another embodiment of the present invention, the super-saturation method for information-media, the agency is a credit agency.

An important aspect of commerce includes controlling and regulating credit facilities. A credit agency is in a position to assist clients requiring to regulate customer credit lines. This can be accomplished in accordance with the present invention by utilizing notifications into a variety of media, such as telephone and cellular telephone databases.

According to an additional embodiment of the present invention, the super-saturation method for information-media, the agency is a public service organization.

Public service organizations are often called on to assist members of the public in a large range of problems. These include, for example, finding a lost pet, tracing missing persons, assisting old-age pensioners and so on. Placing notifications in available media is pertinent to resolving such problems.

According to a further embodiment of the present invention, the super-saturation method for information-media, the agency is a legally empowered body.

A multiplicity of legal matters form part of today's relationships with bodies such as banks, home loan institutions, adoption agencies and many others. Inevitably, legal matters include placing of various notices including notices of advisement, warning, information and a host of others. Access to all media is an important aspect for any legally empowered body.

According to an alternative embodiment of the present invention, the super-saturation method for information-media, the agency is a media agency.

A media agency, which has a distinct advantage in dealing with not merely a multiplicity of media, but also advertisers, core information providers, and others. This is important in promoting relationships between advertisers, a substantial array of broadcasters, and other participants in relation to the present invention.

According to one other embodiment of the present invention, the super-saturation method for information-media, the agency is a cellular telephone service.

According to another embodiment of the present invention, the super-saturation method for information-media, the agency is a wireless communication service.

Agencies, in order to be able to form a liaison between advertisers and media broadcasters, need to have a working knowledge of the field of interest. Clearly, enterprises offering cellular telephone services and wireless communication services are able to provide access to a database of customers as well as access to related telephone and other communication media.

According to an added embodiment of the present invention, the super-saturation method for information-media, offering includes selling.

According to an additional embodiment of the present invention, the super-saturation method for information-media, offering includes renting.

According to a further embodiment of the present invention, the super-saturation method for information-media, offering includes leasing.

According to an alternative embodiment of the present invention, the super-saturation method for information-media, offering includes trading.

According to one other embodiment of the present invention, the super-saturation method for information-media, offering includes proposing for payment.

When an agency becomes aware of a saturation situation at a media broadcaster, the agency makes proposals to prospective advertisers, notification organizations and others with regard to arranging media space. These special message insertions into appropriate media, related to a saturated media site, are negotiated from an offering, selling, renting and selling perspective. Included in this negotiation as part of offering are also trading between media sites and arrangements regarding payment.

According to an added embodiment of the present invention, the super-saturation method for information-media, the offsite content presentation is an advertisement presentation.

Advertisements are commercially important in promoting products and services. Insertion of successful advertisements is ideally made into media sites where core information or personnel are generally involved in related fields. There are many instances, however, where this is not necessary, for example, advertisements for insurance, restaurants, entertainment, etc. have a very general appeal. Therefore, offsite presentations can be made effective by judicious site selection.

For example, people involved with finance and business generally read a financial section of a newspaper. Therefore, a luxury car advertisement is logically shown in that section. If, however, the financial section reader is identified while reading the general news section, the luxury car advertisement is shown to him again.

According to another embodiment of the present invention, the super-saturation method for information-media, the offsite content presentation is a notification.

Notifications generally relate to personnel or core information on a site. Therefore notifications regarding a lost pet, dog licensing requirements, etc. are appropriate to, for example, a magazine dealing with animals, dos and cats, and so on. Notifications of expiry of a media service are ideally made on a service offering the media service such as a cellular or wireless network.

According to a variation of an embodiment of the present invention, the super-saturation method for information-media, the notification is a public service announcement.

An example of this type of notification is using a particular regional telephone exchange to advise of some change in municipal services such as refuse removal, power cuts and water system repairs.

According to another variation of an embodiment of the present invention, the super-saturation method for information-media, the notification is a personal reminder.

The local telephone service and more recently, cellular telephone services have provided personal reminder notifications of many types. For example, wake-up calls, appointment reminders, etc.

According to a further variation of an embodiment of the present invention, the super-saturation method for information-media, the notification is a judicial instrument.

According to an additional variation of an embodiment of the present invention, the super-saturation method for information-media, the notification is a credit warning.

Notifications cover an enormous selection of devises. Examples of these relate to bankruptcy, missing persons, meeting times, excessive spending on a credit card account, marriage, divorce, to name just a few.

According to an added embodiment of the present invention, the super-saturation method for information-media, the offsite content presentation is a graphic item.

Graphic presentations are used in many information-media due to the eye-appeal to the reader and viewer. Examples of graphic presentations, in the context of the present invention, include news photographs, graphical advertising presentations, promotional items, catalogues, cartoons and many more

According to another embodiment of the present invention, the super-saturation method for information-media, the offsite content presentation is a multimedia presentation.

According to a further embodiment of the present invention, the super-saturation method for information-media, the offsite content presentation is an audio presentation.

According to one other embodiment of the present invention, the super-saturation method for information-media, the offsite content presentation is a banner.

Offsite presentations are not limited to merely text or graphic visual effects but include multimedia, audio and banner presentations. These are made up of movie clips, video productions and banners, either as stationary items or as moving presentations.

According to a supplementary embodiment of the present invention, the super-saturation method for information-media, the first information-media is an Internet data communications media.

The Internet represents, in many respects, a rapidly growing communication media accessed by very large numbers of people. Internet sites vary in accordance with core information so that advertisements and any other notifications can be directed at very specific targeted groups of people. Substantially all aspects of the present invention relate well to use in this media, but, are not, by any means, restricted to it.

According to another variation of an embodiment of the present invention, the super-saturation method for information-media, the Internet data communications media includes at least one content presentation of a plurality of content presentations.

An implication of this embodiment relates to a concept that offsite presentations are not necessarily limited to a single presentation, nor to a presentation being limited to a single site or even to a single media.

According to an added embodiment of the present invention, the super-saturation method for information-media, the first information-media is an interactive data communications media.

According to an additional variation of an embodiment of the present invention, the super-saturation method for infor-

mation-media, the interactive data communication media is a telephone communication media.

According to a further variation of an embodiment of the present invention, the super-saturation method for information-media, the interactive data communication media is a wireless communication media.

According to another variation of an embodiment of the present invention, the super-saturation method for information, the interactive data communication media is a cellular communication media.

In the past, advertising and placing of notices was a one-way information transference. An interesting development in the use of Internet advertising and notification techniques is the extent of possible interactivity. This is certainly also the case in many other media such as cellular, wireless and telephone media. By being easily and readily interactive, these media provide users with the possibility of quick responses to notifications.

According to an added embodiment of the present invention, the super-saturation method for information-media, the first information-media is a broadcasting media.

Radio and television broadcasting are the oldest of the electronic communication media. These have been used both by core information presenters and advertisers, to present information to selected groups of people. This is especially true with regard to program material targeting specific population groupings based on selection techniques such as time of presentation.

According to a further embodiment of the present invention, the super-saturation method for information-media, the first information-media is a hyperlink.

Hyperlinks are a very useful way to convey offsite notifications to targeted visitors. Hyperlinks are commonly used for placing advertising links to source presenters. This is achieved also by a broadcaster using a hyperlink to send a presentation item to a visitor's browser or to cause a visitor to fetch the presentation.

According to an alternative embodiment of the present invention, the super-saturation method for information-media, the first information-media is a banner.

Banners are commonly used in a wide selection of media, including magazines, newspapers, bills, internet sites and others. These are usually brief and are an ideal media for drawing attention to other media, other advertisers and so on. Banners are also used for presenting hyperlinks and as a separate media presentation for notices of many types. Banners are used in virtually every communication media and supply a convenient brief communication media. Banners take a form such as headers in a newspaper and magazines, announcements in cellular voice mail systems, presentations in Internet sites, and so on.

According to an additional embodiment of the present invention, the super-saturation method for information-media, the first broadcaster has an association with an interactive data communication media.

According to another embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a Web site on an Internet data communication media.

Sites in this scenario relate to, for example, dissemination of information, news, scientific data, entertainment and many others. Use of added insertions of advertising and notifications includes examples such as insurance promotion, banking, personal notices, product availability, and legal advisements, to name but a few.

According to an added embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is an advertising media.

There are already many Web sites relating exclusively to product and service promotion. These are not necessarily limited to a single product or service, or even a single range of products or services. In many cases, a range of goods and services is quite general. In some cases, broadcasters that are essentially advertising media, use appropriate core presentations as a base for advertising presentations.

According to an embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a credit agency.

These sites relate to placing warning messages and informative notices relating to creditworthiness and to financial status of a range of commercial enterprises and individuals.

According to an embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a credit control agency for a credit card organization.

Such a broadcaster, in the current embodiment context, will make use of a credit card organization database to direct notices to credit card users as well as to suppliers accepting payment by credit card. These notices generally relate, on the one hand to warnings regarding overspending or underpayment by card users, and, on the other hand, warning to suppliers. However, additional uses include promotional additions to billing documents and to information brochures.

According to an embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a banner promotion agency.

According to an embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a public service organization.

Public service organizations provide a wide range of services, for example, to the elderly and infirm, to children, to unmarried mothers, financial and charity, and many others. Many such organizations publish web sites, magazines, newsletters and so on. Many include advertisements and a host of other notices.

According to an embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a legally empowered body.

A classic example of such a body is the revenue service although there are others such as the Society for the Protection of Animals, child protection agencies, pension and social benefit bodies, to name a few.

According to an embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a media agency.

According to an embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a cellular telephone service provider.

According to an embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a wireless communication media.

All the aforementioned media are able to utilize the present invention for promotional, advertising and notification to their customer base. This represents a large number of individuals and enterprises, which can be grouped into targeted databases. Advertising and notification messages are then sent to specifically targeted groups.

According to an embodiment of the present invention, the super-saturation method for information-media, the first broadcaster is a hyperlink.

A hyperlink provides a route for easy access to anywhere on the World Wide Web. Apart from a particular link, access

is available to specific sites and to specific groups of sites having similar core information or similar areas of interest, for example, a group of sites relating to philately, dog breeding, hunting, and medicine, to name a few.

According to an embodiment of the present invention, the super-saturation method for information-media, tagging a preponderance of visitors includes placing a cookie into each visitor of the preponderance of visitors.

According to a variation of an embodiment of the present invention, the super-saturation method for information-media, in which placing a cookie into each visitor of the preponderance of visitors includes placing an identification message into each visitor's web browser when the visitor requests a page.

A cookie is a message given to a Web browser by a Web server. The browser stores the message in a special text file. This message is sent back to the server each time the browser requests a page from the server. This cookie then provides an identification of the visitor.

According to an embodiment of the present invention, the super-saturation method for information-media, tagging a preponderance of visitors includes placing a notification into a telephone system database for each visitor of the preponderance of visitors.

According to an embodiment of the present invention, the super-saturation method for information-media, tagging a preponderance of visitors includes placing a message identifier record into a database for each of the preponderance of visitors.

In these instances, effectively, a result similar to using a cookie is achieved. However, instead of using the Web, a media database is utilized.

According to an embodiment of the present invention, the super-saturation method for information-media, tagging a preponderance of visitors includes placing a credit warning into a creditcard database for each visitor of the preponderance of visitors.

Notifying credit card users of overspending and under-payments are often used warnings. Notices are appended to credit card billing, sent to cardholders via merchants at the time of a transaction, and so on. Notices are also of an informative and promotional nature to encourage additional card use.

According to an embodiment of the present invention, the super-saturation method for information-media, tagging a preponderance of visitors includes placing a personal notice into a public service database for each visitor of the preponderance of visitors.

Notices for lost and found items, personal matters and many others are not uncommon uses for this media. Search-ing for long-lost relatives is another example. These are, naturally, conveyed to people to whom such notices are pertinent.

According to an embodiment of the present invention, the super-saturation method for information-media, tagging a preponderance of visitors includes sending a legal instru-ment into a legally empowered body database for each visitor of the preponderance of visitors.

The database at such legally empowered body databases enable authorized personnel to trace failure to submit tax returns, failure to pay family maintenance, non-payment of traffic violation fines, and many others.

According to an embodiment of the present invention, the super-saturation method for information-media, tagging a preponderance of visitors includes placing a message into a cellular telephone SIM card for each visitor of the prepon-derance of visitors.

According to an embodiment of the present invention, the super-saturation method for information-media, tagging a preponderance of visitors includes placing a notification into a wireless communication service database for each visitor of the preponderance of visitors.

These databases are useful predominantly to the enter-prise owning the database. However, these are also com-monly used for advertising notices, product and service promotions, etc.

According to an embodiment of the present invention, the super-saturation method for information-media, each visitor of the preponderance of visitors to the first information-media is classified as a preferred visitor.

According to a variation of an embodiment of the present invention, the super-saturation method for information-me-dia, wherein the preferred visitor includes each visitor of the preponderance of visitors classified as a preferred visitor remaining at the first information-media for a predetermined period of time.

According to a variation of an embodiment of the present invention, the super-saturation method for information-me-dia, wherein each visitor of the preponderance of visitors classified as a preferred visitor includes a visitor spending a predetermined amount of money at the first information-media.

In order to reach substantially the same targeted group of visitors at a second site, a tag is placed into specific visitors to the first site. Visitors are evaluated, according to particular criteria, and only those evaluated as preferred and are tagged. Generally, these criteria relate to time spent at the first site and to money spent. However, other criteria can be set such as, for example, replies to special questionnaires, responses to specific details, reaction to predetermined aspects of the first site etc.

According to an embodiment of the present invention, the super-saturation method for information-media, the tag is a cookie.

According to an embodiment of the present invention, the super-saturation method for information-media, the tag is an identification message.

According to an embodiment of the present invention, the super-saturation method for information-media, the tag is a notification in a telephone system database.

According to an embodiment of the present invention, the super-saturation method for information-media, the tag is a message identifier record in a database.

According to an embodiment of the present invention, the super-saturation method for information-media, the tag is a credit warning in a credit card database.

According to an embodiment of the present invention, the super-saturation method for information-media, the tag is a personal notice in a public service database.

According to an embodiment of the present invention, the super-saturation method for information-media, the tag is a legal instrument in a legally empowered body database.

According to an embodiment of the present invention, the super-saturation method for information-media, the tag is a message in a cellular telephone SIM card.

According to an embodiment of the present invention, the super-saturation method for information-media, the tag is a notification into a wireless communication service database.

Generally, tags and the process of tagging have mutatis mutandis, been described heretofore in relation to tagging.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster has an association with an interactive data communication media.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a Web site on an Internet data communication media.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is an advertising media.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a credit agency.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a credit control agency for a credit card organization.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a banner promotion agency.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a public service organization.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a legally empowered body.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a media agency.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a cellular telephone service provider.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a wireless communication media.

According to an embodiment of the present invention, the super-saturation method for information-media, the second broadcaster is a hyperlink.

With respect to the second broadcaster, comments already made in regard to the first broadcaster are mutatis mutandis equally applicable here, given regard to the fact that both broadcaster can operate on the same or on different media.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation, includes receiving an advertisement presentation.

This offsite presentation relates to, for example, an advertisement presentation, a notification, a warning, a judicial notice and so on. This presentation would have been found in the first broadcaster site but for the first broadcaster having reached a point of saturation. The present invention provides a method for visitors to the first site, to receive these presentations at another site. This is achieved as a consequence of an agency coordinating tagging of visitors by the first broadcaster and coordinating with the second broadcaster recognizing each tagged visitor.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation, includes receiving a public service announcement.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation, includes receiving a personal reminder.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in

conjunction with the agency the second broadcaster accepting the offsite content presentation includes receiving judicial instrument.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation includes receiving a credit warning.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation includes receiving a graphic item.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation includes receiving a multimedia presentation.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation includes receiving an audio presentation.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation includes receiving a banner.

In the accepting the offsite presentation, it is implicit that the second broadcaster is providing tagged visitors, from the first site, with access to presentations which otherwise would have appeared in the first broadcaster. The reason for the second broadcaster providing this service relates primarily to a state of saturation in the first broadcaster. This relationship between first and second broadcaster is facilitated by an agency that has an association with both broadcasters, and, particularly the needs of advertisers in the first broadcaster. It is this knowledge that allows the agency to provide a suitable second broadcaster with a similar targeted customer base to the first broadcaster. It is this that makes offsite promotional and advisory notices in a second broadcaster, of interest to both first broadcaster and to advertisers.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation for the recognized visitor includes the second broadcaster dropping the offsite content presentation into a browser of the visitor.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the agency the second broadcaster accepting the offsite content presentation for the recognized visitor includes the second broadcaster sending a browser of the visitor to fetch the offsite content presentation.

Both dropping the offsite presentation into a visitor as well as sending the visitor to fetch offsite presentation are techniques usable by browsers in relation to the Internet. Similar procedures are possible in most other media. For example, insertion of appropriate data into a cellular telephone SIM card will advise a user regarding some presentation and equally will advise the user to proceed to some other media to fetch this information. Similar applications are feasible in regard to credit card users to mention just a few.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in

conjunction with the agency the second broadcaster accepting the offsite content presentation for the recognized visitor includes the second broadcaster sending the offsite content presentation to the recognized visitor via the second information-media.

Generally, substantially all comments and descriptions regarding interaction between an agency and the second broadcaster, apply mutatis mutandis to interaction of the first broadcaster in conjunction with the second broadcaster. However, negotiations between these broadcasters are made directly without the liaison assistance of an agency.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation, includes receiving an advertisement presentation.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation, includes receiving a public service announcement.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation, includes receiving a personal reminder.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation includes receiving judicial instrument.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation includes receiving a credit warning.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation includes receiving a graphic item.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation includes receiving a multimedia presentation.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation includes receiving an audio presentation.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation includes receiving a banner.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation for the recognized visitor includes the second broadcaster dropping the offsite content presentation into the browser of the visitor.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation for the recognized visitor includes the second broadcaster sending the browser of the visitor to fetch the offsite content presentation.

According to an embodiment of the present invention, the super-saturation method for information-media, in which in conjunction with the first broadcaster the second broadcaster accepting the offsite content presentation for the recognized visitor includes the second broadcaster sending the offsite content presentation to the recognized visitor via the second information-media.

According to an embodiment of the present invention, the super-saturation method for information-media, the second information-media and the first information-media constitute a single media. For example, a lucrative section (advertising sold out) and a non-lucrative section (advertising space available) of a single Internet web-site.

Various descriptive and definitive comments made regarding the first information-media apply mutatis mutandis to the second information-media. While these media can be different types of media, these can equally be the same media. This will commonly be the situation when using the Internet but this applies also to, for example, telephone, wireless and cellular networks. In addition, it is also feasible that the content provider is the first information-media; since it is not specifically necessary for a host and a service provider and a site to be the same entity.

According to an embodiment of the present invention, the super-saturation method for information-media, the second information-media is an Internet data communications media.

According to a variation of an embodiment of the present invention, the super-saturation method for information-media, the Internet data communications media includes at least one content presentation of a plurality of content presentations such as a web site or a multi-media down load or a channel of updated information or web radio or web television.

According to an embodiment of the present invention, the super-saturation method for information-media, the second information-media is an interactive data communications media.

According to a variation of an embodiment of the present invention, the super-saturation method for information-media, the interactive data communication media is a telephone communication media.

According to a variation of an embodiment of the present invention, the super-saturation method for information-media, the interactive data communication media is a wireless communication media.

According to a variation of an embodiment of the present invention, the super-saturation method for information-media, the interactive data communication media is a cellular communication media.

According to an embodiment of the present invention, the super-saturation method for information-media, the second information-media is a broadcasting media.

According to an embodiment of the present invention, the super-saturation method for information-media, the second information-media is a hyperlink.

According to an embodiment of the present invention, the super-saturation method for information-media, the second information-media is a banner.

According to an embodiment of the present invention, the super-saturation method for information-media, in which recognizing a visitor to the second information-media includes accessing a cookie.

According to an embodiment of the present invention, the super-saturation method for information-media, in which

recognizing a visitor to the second information-media includes receiving an identification message.

According to an embodiment of the present invention, the super-saturation method for information-media, in which recognizing a visitor to the second information-media includes querying a notification in a telephone system database.

According to an embodiment of the present invention, the super-saturation method for information-media, in which recognizing a visitor to the second information-media includes identifying a message identifier record in a database.

According to an embodiment of the present invention, the super-saturation method for information-media, in which recognizing a visitor to the second information-media includes receiving a credit warning in a credit card database.

According to an embodiment of the present invention, the super-saturation method for information-media, in which recognizing a visitor to the second information-media includes searching for a personal notice in a public service database.

According to an embodiment of the present invention, the super-saturation method for information-media, in which recognizing a visitor to the second information-media includes querying a legal instrument in a legally empowered body database.

According to an embodiment of the present invention, the super-saturation method for information-media, in which recognizing a visitor to the second information-media includes searching for a message in (conjunction with the use of) a cellular telephone SIM card.

According to an embodiment of the present invention, the super-saturation method for information-media, in which recognizing a visitor to the second information-media includes finding a notification into a wireless communication service database.

It is an essential part of the present invention that in recognizing a visitor to the second information-media, a notification is found by the second broadcaster that had been placed in the visitor by the first broadcaster. The second broadcaster needed to provide this identification and recognition system to facilitate the concept of offsite advertising and the inserting of other notifications. There is an equivalence in these notifications, for example of a cookie in an Internet browser, a message emanating from a cellular telephone media database, a credit card warning emanating from a credit card users database, etc.

According to an embodiment of the present invention, the contracting structure for facilitating super-saturation of an information-media, a content provider is a store.

According to an embodiment of the present invention, the contracting structure for facilitating super-saturation of an information-media, a content provider is a service provider.

According to an embodiment of the present invention, the contracting structure for facilitating super-saturation of an information-media, a content provider is an advertisement provider.

According to an embodiment of the present invention, the contracting structure for facilitating super-saturation of an information-media, a content provider is a notification provider.

In describing a content provider as a store, a service provider, an advertisement provider, a notification provider, these are all enterprises or individuals wishing to provide notifications to viewers, listeners and readers of a variety of media. In addition, first broadcaster can also be the content

provider. Motivation for these content providers relate to commercial, interpersonal, legal, institutional, advisory and many other matters.

According to an embodiment of the present invention, the contracting structure for facilitating super-saturation of an information-media, an identified visitor is a visitor recognized by a cookie in a browser of the visitor.

According to an embodiment of the present invention, the contracting structure for facilitating super-saturation of an information-media, an identified visitor is a visitor recognized by a tag placed in a memory media associated with the visitor.

Details relating to an identified visitor are generally described in terms of tags and tagging of visitors with regard to a super-saturation method for information-media and apply mutatis mutandis to the contracting structure for facilitating super-saturation of an information-media.

The present invention relates also to a computer program product including a computer usable media having computer readable program code embodied therein for a super-saturation method for information-media, the computer readable program code in said article of manufacture including:

a) first computer readable program code for causing an agency to facilitate visitor identification;

b) tied to the first computer readable software, second computer readable program code for causing, in conjunction with the agency, a first broadcaster of the first information-media to tag a preponderance of visitors to the first information-media with a tag; and

c) tied to the second computer readable software, third computer readable program code for causing, in conjunction with the agency, a second broadcaster of a second information-media to recognize a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first broadcaster—to accept the offsite content presentation for the recognized visitor.

The present invention relates in addition to a computer program product including a computer usable media having computer readable program code embodied therein for a super-saturation method for information-media, the computer readable program code in said article of manufacture including a computer readable program code for causing an agency to facilitate visitor identification.

The present invention relates further to a computer program product including a computer usable media having computer readable program code embodied therein for a super-saturation method for information-media, the computer readable program code in said article of manufacture including a computer readable program code for causing, in conjunction with the agency, a first broadcaster of the first information-media to tag a preponderance of visitors to the first information-media with a tag.

The present invention relates furthermore to a computer program product including a computer usable media having computer readable program code embodied therein for a super-saturation method for information-media, the computer readable program code in said article of manufacture including a computer readable program code for causing, in conjunction with the agency, a second broadcaster of a second information-media to recognize a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first broadcaster—the second broadcaster to accept the offsite content presentation for the recognized visitor.

The present invention relates also to a computer program product including a computer usable media having computer readable program code embodied therein for a contracting structure for facilitating super-saturation of an information-media the computer readable program code in said article of manufacture including a

a) first computer readable program code for causing, a first contractual agreement between an agency offering an offsite content presentation for a first information-media and a content provider accepting said offering;

   i) whereby the agency provides a facilitated delivery of a content of the first content provider to an identified visitor visiting offsite; and

   ii) whereby the content provider pays for the facilitated delivery;

b) tied to the first computer readable software, second computer readable program code for causing a second contractual agreement between the agency and a first broadcaster of the first information-media;

   i) whereby the first broadcaster provides a facilitated tagging of a preponderance of visitors to the first information-media; and

   ii) whereby the agency provides a facilitated offsite placement of a content deriving from the first contractual agreement, the agency paying the first broadcaster for substantially each such facilitated placement; and

c) tied to the second computer readable software, third computer readable program code for causing a third contractual agreement between the agency and a second broadcaster of a second information-media;

   i) whereby the second broadcaster provides a facilitated recognizing of a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first broadcaster—the second broadcaster provides a facilitated accepting the offsite content presentation for the recognized visitor; and

   ii) whereby the agency pays for the facilitated delivery accepting.

The present invention relates in addition to a computer program product including a computer usable media having computer readable program code embodied therein for a contracting structure for facilitating super-saturation of an information-media the computer readable program code in said article of manufacture including a first computer readable program code for causing, a first contractual agreement between an agency offering an offsite content presentation for a first information-media and a content provider accepting said offering: a first contractual agreement between an agency offering an offsite content presentation for a first information-media and a content provider accepting said offering;

a) whereby the agency provides a facilitated delivery of a content of the first content provider to an identified visitor visiting offsite; and

b) whereby the content provider pays for the facilitated delivery.

The present invention relates further to a computer program product including a computer usable media having computer readable program code embodied therein for a contracting structure for facilitating super-saturation of an information-media the computer readable program code in said article of manufacture including a second computer

readable program code for causing a second contractual agreement between the agency and a first broadcaster of the first information-media;

a) whereby the first broadcaster provides a facilitated tagging of a preponderance of visitors to the first information-media; and

b) whereby the agency provides a facilitated offsite placement of a content deriving from the first contractual agreement, the agency paying the first broadcaster for substantially each such facilitated placement.

The present invention relates to a computer program product including a computer usable media having computer readable program code embodied therein for a contracting structure for facilitating super-saturation of an information-media the computer readable program code in said article of manufacture including a second computer readable program code for causing a third contractual agreement between the agency and a second broadcaster of a second information-media:

a) whereby the second broadcaster provides a facilitated recognizing of a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first broadcaster—the second broadcaster provides a facilitated accepting the offsite content presentation for the recognized visitor; and

b) whereby the agency pays for the facilitated delivery accepting.

The present invention also relates to a program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for a super-saturation method for information-media, said method steps including:

a) an agency facilitating visitor identification;

b) in conjunction with the agency, a first broadcaster of the first information-media tagging a preponderance of visitors to the first information-media with a tag; and

c) in conjunction with the agency, a second broadcaster of a second information-media recognizing a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first broadcaster—the second broadcaster provides a facilitated accepting the offsite content presentation for the recognized visitor.

The present invention relates in addition to a program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for a super-saturation method for information-media, said method step including an agency facilitating visitor identification.

The present invention further relates to a program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for a super-saturation method for information-media, said method step including in conjunction with the agency, a first broadcaster of the first information-media tagging a preponderance of visitors to the first information-media with a tag.

The present invention relates furthermore to a program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for a super-saturation method for information-media, said method step including in conjunction with the agency, a second broadcaster of a second information-media recognizing a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first

broadcaster—the second broadcaster accepting the offsite content presentation for the recognized visitor.

The present invention further also relates to a program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for a contracting structure for facilitating super-saturation of an information-media, said method steps including:

a) a first contractual agreement between an agency offering an offsite content presentation for a first information-media and a content provider accepting said offering;

    i) whereby the agency provides a facilitated delivery of a content of the first content provider to an identified visitor visiting offsite; and

    ii) whereby the content provider pays for the facilitated delivery;

b) a second contractual agreement between the agency and a first broadcaster of the first information-media:

    i) whereby the first broadcaster provides a facilitated tagging of a preponderance of visitors to the first information-media; and

    ii) whereby the agency provides a facilitated offsite placement of a content deriving from the first contractual agreement, the agency paying the first broadcaster for substantially each such facilitated placement; and

c) a third contractual agreement between the agency and a second broadcaster of a second information-media:

    i) whereby the second broadcaster provides a facilitated recognizing of a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first broadcaster—the second broadcaster accepting the offsite content presentation for the recognized visitor; and

    ii) whereby the agency pays for the facilitated delivery accepting.

The present invention relates to a program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for a contracting structure for facilitating super-saturation of an information-media, said method including: a first contractual agreement between an agency offering an offsite content presentation for a first information-media and a content provider accepting said offering:

a) whereby the agency provides a facilitated delivery of a content of the first content provider to an identified visitor visiting offsite; and

b) whereby the content provider pays for the facilitated delivery.

The present invention also relates to a program storage device readable by machine, tangibly embodying a program of instructions executable by the machine to perform method steps for a contracting structure for facilitating super-saturation of an information-media, said method including a second contractual agreement between the agency and a first broadcaster of the first information-media:

a) whereby the first broadcaster provides a facilitated tagging of a preponderance of visitors to the first information-media; and

b) whereby the agency provides a facilitated offsite placement of a content deriving from the first contractual agreement, the agency paying the first broadcaster for substantially each such facilitated placement.

The present invention in addition relates to a program storage device readable by machine, tangibly embodying a

program of instructions executable by the machine to perform method steps for a contracting structure for facilitating super-saturation of an information-media, said method including a third contractual agreement between the agency and a second broadcaster of a second information-media:

a) whereby the second broadcaster provides a facilitated recognizing of a visitor to the second information-media as having the tag, and thereupon by proxy—either in conjunction with the agency or in conjunction with the first broadcaster—the second broadcaster provides a facilitated accepting the offsite content presentation for the recognized visitor; and

b) whereby the agency pays for the facilitated delivery accepting.

The invention claimed is:

**1**. A method of facilitating off-site targeted Internet advertising with a first computer controlled by a proprietor of a first Internet site, which proprietor has sold, for a first price, placements of an electronic advertisement on other Internet sites, which advertisement is directed to an offering of a third-party advertiser, the method comprising automatically:

    a. with the first computer, in conjunction with a second computer controlling ad space on the second Internet site, which second computer is controlled by an agency under contract with the proprietor of the second Internet site, detecting visitor computers visiting the second Internet site that have visited a first Internet site and that have a cookie that:

        i. is stored on the visitor computer as a consequence of said visitor computer having visited the first Internet site; and

        ii. allows access to information in a database accessible to the first computer;

    b. with the first computer using the information in the database to identify those of the visitor computers visiting the second Internet site that have conducted a specific predetermined action on the first Internet site;

    c. with the first computer, communicating with the second computer to cause the second computer to direct the electronic advertisement to those of the visitor computers that have been identified, as a result of part (b), as having conducted the specific predetermined action on the first Internet site, for display in ad space on the second Internet site by the identified visitor computers; and

    d. with the first computer, causing a proprietor of the second Internet site to receive revenue, as a result of part (c), in an amount less than the first price, for display of the advertisement;

    e. wherein the proprietor of the first Internet site retains at least part of the difference between the first price and the revenue received by the proprietor of the second Internet site.

**2**. The method of claim **1** wherein the specific predetermined action on the first Internet site comprises a response to a particular question provided via the visitor computer on the first Internet site.

**3**. The method of claim **1** wherein the specific predetermined action on the first Internet site comprises a reaction via the visitor computer to a predetermined aspect of the first Internet site.

**4**. The method of claim **1** wherein the specific predetermined action on the first Internet site comprises remaining on the first Internet site for a predetermined amount of time.

**5**. The method of claim **1** wherein the specific predetermined action on the first Internet site comprises an interest expressed by visiting a section of the first site.

**6**. The method of claim **1** wherein causing the second computer to direct the advertisement comprises the second computer dropping content of the advertisement into a browser of the visitor computer.

**7**. The method of claim **1** wherein causing the second computer to direct the advertisement comprises the second computer directing a browser of the visitor computer to fetch the ad.

**8**. The method of claim **1** wherein the advertisement is directed for display by the identified visitor computers using web television.

**9**. The method of claim **1** wherein the revenue is calculated on a CPM basis.

**10**. The method of claim **1** wherein the revenue is calculated as a percentage of a sales transaction resulting from display of the advertisement.

**11**. The method of claim **1** wherein the subject matter of the advertisement relates to content of the first Internet site but not to content of the second Internet site.

**12**. A tangible first computerized apparatus controlled by a proprietor of a first Internet site, which proprietor has sold, for a first price, placements of an electronic advertisement on other Internet sites, which advertisement is directed to an offering of a third-party advertiser, wherein the first computerized apparatus is programmed to implement a method of facilitating off-site targeted Internet advertising, the method comprising automatically:

a. in conjunction with a second computer controlling ad space on the second Internet site, which second computer is controlled by an agency under contract with the proprietor of the second Internet site, detecting visitor computers visiting the second Internet site that have visited a first Internet site and that have a cookie that:
   i. is stored on the visitor computer as a consequence of said visitor computer having visited the first Internet site; and
   ii. allows access to information in a database accessible to the first computer;

b. using the information in the database to identify those of the visitor computers visiting the second Internet site that have conducted a specific predetermined action on the first Internet site;

c. communicating with the second computer to cause the second computer to direct the electronic advertisement to those of the visitor computers that have been identified, as a result of part (b), as having conducted the specific predetermined action on the first Internet site, for display in ad space on the second Internet site by the identified visitor computers; and

d. causing a proprietor of the second Internet site to receive revenue, as a result of part (c), in an amount less than the first price, for display of the advertisement;

e. wherein the proprietor of the first Internet site retains at least part of the difference between the first price and the revenue received by the proprietor of the second Internet site.

**13**. The apparatus of claim **12** wherein the specific predetermined action on the first Internet site comprises a response to a particular question provided via the visitor computer on the first Internet site.

**14**. The apparatus of claim **12** wherein the specific predetermined action on the first Internet site comprises a reaction via the visitor computer to a predetermined aspect of the first Internet site.

**15**. The apparatus of claim **12** wherein the specific predetermined action on the first Internet site comprises remaining on the first Internet site for a predetermined amount of time.

**16**. The apparatus of claim **12** wherein the specific predetermined action on the first Internet site comprises an interest expressed by visiting a section of the first site.

**17**. The apparatus of claim **12** wherein causing the second computer to direct the advertisement comprises the second computer dropping content of the advertisement into a browser of the visitor computer.

**18**. The apparatus of claim **12** wherein causing the second computer to direct the advertisement comprises the second computer directing a browser of the visitor computer to fetch the ad.

**19**. The apparatus of claim **12** wherein the advertisement is directed for display by the identified visitor computers using web television.

**20**. The apparatus of claim **12** wherein the revenue is calculated on a CPM basis.

**21**. The apparatus of claim **12** wherein the revenue is calculated as a percentage of a sales transaction resulting from display of the advertisement.

**22**. The apparatus of claim **12** wherein the subject matter of the advertisement relates to content of the first Internet site but not to content of the second Internet site.

**23**. An article comprising a tangible medium that is not a transitory propagating signal encoding computer-readable instructions that, when applied to a tangible first computerized apparatus controlled by a proprietor of a first Internet site, which proprietor has sold, for a first price, placements of an electronic advertisement on other Internet sites, which advertisement is directed to an offering of a third-party advertiser, instruct the first computerized apparatus to automatically implement a method of facilitating off-site targeted Internet advertising, the method comprising:

a. in conjunction with a second computer controlling ad space on the second Internet site, which second computer is controlled by an agency under contract with the proprietor of the second Internet site, detecting visitor computers visiting the second Internet site that have visited a first Internet site and that have a cookie that:
   i. is stored on the visitor computer as a consequence of said visitor computer having visited the first Internet site; and
   ii. allows access to information in a database accessible to the first computer;

b. using the information in the database to identify those of the visitor computers visiting the second Internet site that have conducted a specific predetermined action on the first Internet site;

c. communicating with the second computer to cause the second computer to direct the electronic advertisement to those of the visitor computers that have been identified, as a result of part (b), as having conducted the specific predetermined action on the first Internet site, for display in ad space on the second Internet site by the identified visitor computers; and

d. causing a proprietor of the second Internet site to receive revenue, as a result of part (c), in an amount less than the first price, for display of the advertisement;

e. wherein the proprietor of the first Internet site retains at least part of the difference between the first price and the revenue received by the proprietor of the second Internet site.

**24**. The article of claim **23** wherein the specific predetermined action on the first Internet site comprises a response to a particular question provided via the visitor computer on the first Internet site.

**25**. The article of claim **23** wherein the specific predetermined action on the first Internet site comprises a reaction via the visitor computer to a predetermined aspect of the first Internet site.

**26**. The article of claim **23** wherein the specific predetermined action on the first Internet site comprises remaining on the first Internet site for a predetermined amount of time.

**27**. The article of claim **23** wherein the specific predetermined action on the first Internet site comprises an interest expressed by visiting a section of the first site.

**28**. The article of claim **23** wherein causing the second computer to direct the advertisement comprises the second computer dropping content of the advertisement into a browser of the visitor computer.

**29**. The article of claim **23** wherein causing the second computer to direct the advertisement comprises the second computer directing a browser of the visitor computer to fetch the ad.

**30**. The article of claim **23** wherein the advertisement is directed for display by the identified visitor computers using web television.

**31**. The article of claim **23** wherein the revenue is calculated on a CPM basis.

**32**. The article of claim **23** wherein the revenue is calculated as a percentage of a sales transaction resulting from display of the advertisement.

**33**. The article of claim **23** wherein the subject matter of the advertisement relates to content of the first Internet site but not to content of the second Internet site.

* * * * *